# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

## WONG WAI v. WILLIAMSON et al.

### (Circuit Court, N. D. California. May 28, 1900.)

### No. 12,937.

**1. INJUNCTION—GROUNDS—PROTECTION OF PECUNIARY RIGHTS.**

A court of equity may properly grant an injunction restraining health officers of the United States or of a city from imposing or enforcing unlawful restrictions upon the right of a complainant, and others for whom he sues, to travel or to leave the city in which they are, in the pursuit of their lawful business, where such right has a pecuniary value, and the enforcement of the restrictions complained of will result in irreparable loss and injury to the complainants.

**2. HEALTH—POWER OF HEALTH BOARD TO ESTABLISH RULES—SAN FRANCISCO CHARTER.**

The charter of the city and county of San Francisco vests the legislative power of the corporation in a board of supervisors, and provides that every legislative act shall be by ordinance; and the board of public health thereby created, and charged with the duty of managing the hospitals, alms houses, etc., of enforcing the ordinances, rules, and regulations which may be adopted by the board of supervisors for the securing of good sanitary conditions and the protection of the public health, and of recommending such legislation, has no authority to itself enact legislation or establish rules and regulations for dealing with a supposed serious epidemic.

**3. SAME—POWERS OF HEALTH OFFICERS—LEGALITY OF MEASURES ADOPTED.**

Health officers of a city should be clothed with sufficient authority to enable them to deal with conditions affecting the public health and to meet emergencies in a prompt and effective manner, and they will be upheld in the exercise of a wide discretion in the execution of measures enacted to that end; but where the municipal authority has neglected to provide suitable rules and regulations upon the subject, and the executive officers are left to adopt such measures as they deem suitable for the occasion, their acts are open to judicial review, and, to be sustainable, their measures must respect the constitutional rights of individuals, be uniform in their operation, and reasonably adapted to secure the object in view.

**4. SAME—REGULATIONS FOR PROTECTION AGAINST CONTAGIOUS DISEASES—CONSTITUTIONALITY.**

The board of health of San Francisco adopted a resolution declaring its belief in the existence of bubonic plague in the city, and, in connection with the quarantine officer of the United States for the port, promulgated and enforced an order prohibiting any Chinese or Asiatic person from leaving the city without first submitting to inoculation with a serum supposed

103 F.—1

to be a preventive, but the administration of which to a person who had been exposed to the disease was dangerous to life and contrary to medical authority. There were some 25,000 Chinese residents of the city, many of whom resided in the "Chinese quarter," and many others scattered throughout other parts of the city. The regulation applied only to the Asiatic or Mongolian race, but included them as a class, without regard to the previous condition, habits, exposure to disease, or residence of the individual; nor did it prohibit them from going anywhere within the city. It was not shown or claimed that the disease existed in the country anywhere outside the city, nor was any evidence offered that the Mongolian race, as a class, was more subject to the disease than others. *Held* that, conceding the power of the board to enact proper rules and regulations in the premises, the *one in question had no reasonable relation to the protection of the health of the inhabitants of the city, and was illegal and void, as an unconstitutional invasion of the rights of the persons against whom it was directed.

5. SAME.

Such regulation, discriminating as it does against an entire class, whether native or alien, in violation of the constitutional guaranty of the equal protection of the laws, cannot be sustained by instructions from the supervising surgeon general of the marine hospital service of the United States, directing the health officer of the port to require transportation companies to refuse transportation to Asiatics except on his certificate; such order being based on regulations promulgated by the secretary of the treasury under Act March 27, 1890 (26 Stat. 31). That act provides that whenever it shall be made to appear to the satisfaction of the president that any one of certain contagious diseases exists in a state or territory, and that there is danger of the spread of such disease into other states or territories, he may cause the secretary of the treasury to promulgate such rules and regulations as in his judgment may be necessary to prevent the spread of such disease from one state or territory into another; but there is nothing in such provisions which justifies the promulgation of regulations in violation of constitutional rights, or the adoption and enforcement of such measures by subordinates in their execution.

In Equity. On order to show cause why injunction should not issue.

Reddy, Campbell & Metson (Maguire & Gallagher, Samuel M. Shortridge, John E. Bennett, and Robert Ferral, of counsel), for complainant.

Frank L. Coombs, U. S. Atty., and Marshall B. Woodworth, Asst. U. S. Atty., for defendant J. J. Kinyoun.

Charles L. Weller, Asst. Dist. Atty., for other defendants.

Before MORROW, Circuit Judge, and HAWLEY and DE HAVEN, District Judges.

MORROW, Circuit Judge. This action is brought by the plaintiff, a subject of the emperor of China, residing in the city and county of San Francisco, state of California, against John M. Williamson, Rudolph W. Baum, Louis Bazet, William D. McCarthy, Vincent Buckley, George W. Mendell, and William P. Sullivan, Jr., the acting board of health of said city and county, and J. J. Kinyoun, the acting quarantine officer of the United States government for the port of San Francisco, to restrain the defendants, and all persons acting in their behalf, from requiring the complainant, or any of the Chinese residents of said city and county, to submit to inoculation with the serum known as "Haffkine Prophylactic," and from imprisoning, restrain-

ing, or confining the complainant or any of said Chinese residents within the limits of said city and county until they have submitted to such inoculation, and from interfering with or restraining said Chinese residents in the exercise of their personal liberty to freely pass from said city and county to other parts of the state of California. It is alleged in the bill that on or about the 18th day of May, 1900, the defendants comprising the said board of health adopted and passed a resolution authorizing, directing, and requiring the inoculation of all the Chinese residents of said city and county with the said Haffkine Prophylactic; that the requirements of said resolution are now being enforced by said defendants, and the said Chinese residents are being restrained and imprisoned within the territorial limits of said city and county unless they submit to said inoculation. It is alleged that said Haffkine Prophylactic is a poisonous substance, made and compounded from living bacteria of the bubonic plague; that it is administered to human beings by hypodermic injection into the tissues of the body, and when so injected produces a severe reaction, and causes great pain and distress generally, a sudden and great rise of temperature, and great depression, which sometimes continues, increasing in severity, until it causes death; that the sole and only purpose for which such inoculation is claimed to be effective or useful is to prevent persons from contracting the bubonic plague if exposed thereto after having been so inoculated. It is also alleged that there is not now, and never has been, any case of bubonic plague in said city and county, or in the state of California, nor any germs or bacteria of said disease. The complainant avers that he has never had or contracted said bubonic plague, and has never been exposed to the danger of contracting it, and complains that the action of the said defendants in confining and imprisoning the said Chinese residents of said city and county is a wrongful and oppressive interference with their personal liberty and their right to the pursuit of their lawful business. It is further alleged that said resolution adopted by the defendants is wholly invalid, void, and contrary to the constitution and laws of the United States and of the laws of the state of California; that said resolution and order is not enforced against other residents of said city and county than those of the Mongolian race, and its enforcement deprives the said Chinese residents of said city and county of the equal protection of the laws, and of their rights and liberties under the constitution of the United States, and the laws and treaties passed and adopted pursuant thereto. The complainant brings this suit, also, in behalf of the 25,000 persons of the Chinese race now residing in said city and county. The prayer of the bill is that an injunction be granted enjoining and restraining the defendants, their agents, employés, and all persons acting in their behalf, from imprisoning, restraining, or confining the complainant, or any of the Chinese residents of said city and county of San Francisco, within the limits of said city and county, or otherwise interfering with or restraining the complainant, or any of said Chinese residents of said city and county, in the exercise of their personal liberty to freely pass from said city and county of San Francisco to other parts of the state of California, and from

requiring the complainant, or any of said Chinese residents of said city and county, to submit to inoculation with said Haffkine Prophylactic under penalty of being so confined or restrained or restricted in their right to freely pass from said city and county of San Francisco to other parts of the state of California. Among the affidavits in support of the bill is one by Louis Quong, who declares that he is a person of Chinese extraction, born in the state of California of Chinese parents; that he has been refused permission by the defendants to leave the city and county of San Francisco unless he first obtains a certificate from the board of health of the said city and county, countersigned by J. J. Kinyoun, quarantine officer of the United States for the port of San Francisco, to the effect that the affiant has been inoculated with the preparation known as "Haffkine Prophylactic."

Upon the filing of the bill of complaint, together with affidavits supporting the allegations therein contained, the court issued an order to the defendants to show cause why an injunction should not issue, restraining the defendants from committing the acts and carrying into execution the threats set forth in the bill of complaint. To the order to show cause no return has been made as required by the rules of practice in equity cases, but in lieu thereof the defendants John M. Williamson, Rudolph Baum, Louis Bazet, William D. McCarthy, Vincent Buckley, George W. Mendell, and William P. Sullivan, Jr., composing the board of health of the city and county of San Francisco, have produced a copy of a resolution adopted by the board on May 18, 1900, as follows:

"Resolved, that it is the sense of this board that bubonic plague exists in the city and county of San Francisco, and that all necessary steps already taken for the prevention of its spread be continued, together with such additional measures as may be required."

The defendant J. J. Kinyoun, the acting quarantine officer of the United States at the port of San Francisco, in response to the order has produced the following telegram:

"Washington, D. C., May 21, 1900.

"Surgeon Kinyoun, Angel Island, California: By direction of the president, secretary of treasury has promulgated the following regulations under act of congress March twenty-seventh, eighteen ninety: First, during the existence of plague at any point in the United States the surgeon general, marine hospital service, is authorized to forbid the sale or donation of transportation by common carriers to Asiatics or other races liable to the disease; second, no common carrier shall accept for transportation any person suffering with plague, or any article infected therewith, nor shall common carriers accept for transportation any class of persons who may be designated by the surgeon general of the marine hospital service as being likely to convey the risk of plague contagion to other communities, and said common carriers shall be subject to inspection. Inform transportation companies, and direct them, under above regulations, to refuse transportation to Asiatics, except on your certificate, and instruct bonded inspectors to inspect trains and prevent Asiatics leaving state without your certificate.

"Wyman, Surgeon General Marine Hospital Service."

No objections being offered to these documents as constituting the return of the defendants, they will be so considered.

The court suggested at the hearing the question whether, upon the facts stated in the bill of complaint, an injunction would lie. Thereupon a parol exception was taken to the bill. After further in-

vestigation, the court is of the opinion that it is the proper remedy. The cause of action is not merely that the complainant is deprived of his personal liberty. He and a number of others similarly situated are being deprived by the defendants of their right to travel from San Francisco to other parts of the state in the pursuit of lawful business, and this right, it is alleged, has a pecuniary value to the complainant in excess of the amount required to give this court jurisdiction of the case. The permission to travel being by the acts of the defendants coupled with an alleged unlawful condition or restriction, it is the province of the court to inquire into the facts, and remove the restriction, if found unlawful. This is undoubtedly the principle involved in the numerous cases where courts have granted injunctions to relieve parties from the restrictions and pecuniary injuries inflicted by boycotts, lockouts, and strikes. Wire Co. v. Murray (C. C.) 80 Fed. 811; Mackall v. Ratchford (C. C.) 82 Fed. 41; United States v. Debs (C. C.) 64 Fed. 724; In re Debs, 158 U. S. 573, 15 Sup. Ct. 900, 39 L. Ed. 1092; Beard v. Burts, 95 U. S. 434, 24 L. Ed. 485. In our opinion, the bill is sufficient, and the parol exception must be overruled.

The defendants constituting the board of health of the city and county of San Francisco contend that they are justified in their action with respect to the matter in controversy under their authority as a board, acting pursuant to the resolution of the board of May 18, 1900. The charter of the city and county of San Francisco provides, in article 10, for a department of public health, under the management of a board of health, consisting of seven members. Section 3 of the article provides that the board of health shall have the management and control of the city and county hospitals, alms houses, ambulance service, municipal hospitals, receiving hospitals, and of all matters pertaining to the preservation, promotion, and protection of the lives and health of the inhabitants of the city and county. Section 4 provides, among other things, that the board shall enforce all ordinances, rules, and regulations which may be adopted by the supervisors for the carrying out and enforcement of a good sanitary condition in the city and county, and for the protection of the public health; and the board is required to submit to the supervisors, from time to time, a draft of such ordinances, rules, and regulations as it may deem necessary to promote the objects mentioned in the section. By section 1 of article 2 of the charter, the legislative power of the city and county of San Francisco is vested in a legislative body designated as the "Board of Supervisors," and in section 8 it is provided that every legislative act of the city and county shall be by ordinance. It thus appears that suitable provision has been made in the city charter for the necessary legislation providing rules and regulations to secure proper sanitary conditions in the city and for the protection of the public health, but we are not advised that the board of supervisors has taken any action whatever in that direction; and the resolution of the board of health furnished to the court fails to disclose the method it has adopted for that purpose, under the conditions it has declared to exist. We need not, however, dwell upon the manifest lack of legislative authority to enable the board

of health to deal with this important subject. It is sufficient for the present purpose to mention the fact, as one of the features of the situation to, be considered in connection with the regulations which the complainant alleges have been imposed upon him and other Chinese residents of the city by the defendants.

It appears that there are about 25,000 Chinese residents in the city of San Francisco, and, while it is well known that a large number of these people are domiciled within the area designated as the "Chinese Quarter," nevertheless there are a great many scattered over the city, engaged in various employments. No restrictions have been placed upon any of the Chinese residents in passing from one part of the city to the other; nor has any house, block, or section of the city been declared infected or unsanitary. There is, therefore, no fact established by the board of supervisors or by the board of health from which an inference might be drawn that any particular class of persons, or persons occupying a particular district, were liable to develop, or in danger of developing, the plague. The restriction is that no Chinese person shall depart from the city without being inoculated with the serum called "Haffkine Prophylactic." The city has a population of about 350,000, but the restriction does not apply to any of the inhabitants other than Chinese or Asiatics, and the inhabitants other than Chinese or Asiatics are permitted to depart from and return to the city without being subject to the inoculation imposed upon the Chinese inhabitants. This restriction, it is alleged, discriminates unreasonably against the complainant and other Chinese residents, confines them within the territorial limits of the city and county, and deprives them of their liberty, causing them great and irreparable loss and injury.

The conditions of a great city frequently present unexpected emergencies affecting the public health, comfort, and convenience. Under such circumstances, officers charged with the duties pertaining to this department of the municipal government should be clothed with sufficient authority to deal with the conditions in a prompt and effective manner. Measures of this character, having a uniform operation, and reasonably adapted to the purpose of protecting the health and preserving the welfare of the inhabitants of a city, are constantly upheld by the courts as valid acts of legislation, however inconvenient they may prove to be, and a wide discretion has also been sanctioned in their execution. But when the municipal authority has neglected to provide suitable rules and regulations upon the subject, and the officers are left to adopt such methods as they may deem proper for the occasion, their acts are open to judicial review, and may be examined in every detail to determine whether individual rights have been respected in accordance with constitutional requirements. This proposition is too clear to require discussion. Indeed, the inquiry has been extended to acts of the legislature and city ordinances, for the purpose of determining whether they are appropriate to the end in view. In the recent case of Blue v. Beach, 56 N. E. 89, the supreme court of Indiana had under consideration a law of the state and an ordinance of the city of Terre Haute prohibiting persons from attending the public schools who had not been vaccinated. The court

sustained the validity of the measures, but in arriving at that conclusion it states very clearly the principles and limitations involved in such legislation. It says:

"As a general proposition, whatever laws or regulations are necessary to protect the public health and secure public comfort is a legislative question, and appropriate measures intended and calculated to accomplish these ends are not subject to judicial review. But nevertheless such measures or means must have some relation to the end in view, for, under the mere guise of the police power, personal rights and those pertaining to private property will not be permitted to be arbitrarily invaded by the legislative department; and consequently its determination, under such circumstances, is not final, but is open to review by the courts. If the legislature, in the interests of the public health, enacts a law, and thereby interferes with the personal rights of an individual,—destroys or impairs his liberty or property,—it then, under such circumstances, becomes the duty of the courts to review such legislation, and determine whether it in reality relates to, and is appropriate to secure, the object in view; and in such an examination the court will look to the substance of the thing involved, and will not be controlled by mere forms."

In the light of these well-established principles, the action of the defendants as described in the bill of complaint cannot be justified. The regulations they have adopted appear to be without legislative authority, but assuming that they have the sanction of a general authority under the resolution of May 18, 1900, still they cannot be sustained. They are not based upon any established distinction in the conditions that are supposed to attend this plague, or the persons exposed to its contagion, but they are boldly directed against the Asiatic or Mongolian race as a class, without regard to the previous condition, habits, exposure to disease, or residence of the individual; and the only justification offered for this discrimination was a suggestion made by counsel for the defendants in the course of the argument, that this particular race is more liable to the plague than any other. No evidence has, however, been offered to support this claim, and it is not known to be a fact. This explanation must therefore be dismissed as unsatisfactory.

There is, however, a further and a more serious objection to these regulations adopted by the defendants. It appears from the instructions of Dr. Walter Wyman, the supervising surgeon general of the marine hospital service, that the Haffkine Prophylactic is not designed as a preventive after a person has been exposed to the disease. On the contrary, its administration under such a condition of the human system is declared to be dangerous to life. It is administered for the purpose of preventing contagion from exposure after inoculation, and for that alone. A person about to enter an infected place should therefore secure this treatment, but a person departing from an infected place should not be so treated. For the latter contingency Dr. Wyman prescribes another and very different remedy, namely, inoculation with the "Yersin Serum." The two treatments are thus described in the instructions issued by the supervising surgeon general of the marine hospital service:

"The Haffkine material should not be used if the person has been definitely exposed to the plague, or is thought to be in the incubative period; for, if by chance he is already infected, the Haffkine injection may produce fatal results. Therefore the Haffkine material should be used as a preventive on persons before their exposure, while the Yersin treatment may be used either

before or after exposure, or while a person is suffering with the disease. [Note.] The Haffkine material should not be used on suspects held in quarantine, or on persons who have been definitely exposed to the plague, but is applicable to persons who are liable to be brought into contact with plague, and before such possible contact, as quarantine officers and attendants, health officers and employés, and persons in a community where there is danger of the introduction and spread of the disease."

It therefore appears that the administration of Haffkine Prophylactic to Chinese persons departing from San Francisco has no relation to the public health of the inhabitants of this city, and cannot be sustained by any such claim on the part of its board of health.

The defendant J. J. Kinyoun, as quarantine officer of the United States at the port of San Francisco, justifies his action upon the authority of the telegram received by him from Dr. Wyman, the supervising surgeon general, marine hospital service, dated May 21, 1900, and it is contended that the instructions contained in this telegram are based upon the provisions of the act of March 27, 1890 (26 Stat. 31). Section 1 of that act provides as follows:

"That whenever it shall be made to appear to the satisfaction of the president that cholera, yellow fever, small pox, or plague exists in any state or territory or in the District of Columbia, and that there is danger of the spread of such disease into other states, territories, or the District of Columbia, he is hereby authorized to cause the secretary of the treasury to promulgate such rules and regulations as in his judgment may be necessary to prevent the spread of such disease from one state or territory into another, or from any state or territory into the District of Columbia, or from the District of Columbia into any state or territory, and to employ such inspectors and other persons as may be necessary to execute such regulations to prevent the spread of such disease. The said rules and regulations shall be prepared by the supervising surgeon-general of the marine hospital service under the direction of the secretary of the treasury."

It will be observed that the statute is open to the interpretation that the promulgation of rules and regulations to prevent the spread of the diseases named in the statute is made to depend upon the fact that it has been made to appear to the satisfaction of the president that the diseases exist in the particular state or territory where the regulations are to be enforced. If this is the proper interpretation to be placed upon the statute, then the enforcement of any rules and regulations is open to the objection that it does not appear that the president has found that the plague exists in San Francisco or in California, or, indeed, anywhere else in the United States; nor does it appear that the supervising surgeon general has so found, or that he has prescribed any regulations requiring the administering of Haffkine Prophylactic under any conditions, or to parties seeking transportation from one place in the state to another place in the same state or from one state to another. The only restriction imposed by the surgeon general is that transportation companies shall refuse transportation to Asiatics unless provided with the certificates of the defendant Kinyoun. What examination or treatment is required to entitle a Chinese person to this certificate is not provided in the instructions of the supervising surgeon general. The instructions are therefore plainly insufficient, in these essential particulars, to justify the defendant Kinyoun in the restrictions and conditions he

has placed upon the complainant and those represented in the bill of complaint.

But, passing by these objections, we come again to the discriminating character of the regulations. They are directed against the Asiatic race exclusively, and by name. There is no pretense that previous residence, habits, exposure to disease, method of living, or physical condition has anything to do with their classification as subject to the regulations. They are denied the privilege of traveling from one place to another, except upon conditions not enforced against any other class of people; and this privilege is denied, it appears, to Chinese persons born in the United States as well as to those born elsewhere. As against this regulation, the complainant, on behalf of himself and others similarly situated, invokes the equal protection of the laws. As the case is here presented, how can the court deny them this right? In the case of Ho Ah Kow v. Nunan (before Mr. Justice Field in this court) 5 Sawy. 552, Fed. Cas. No. 6,546, the plaintiff had been convicted in a court in San Francisco, and sentenced to pay a fine of $10, or, in default of such payment, to be imprisoned five days in the county jail. The defendant, as sheriff of the city and county of San Francisco, had charge of the jail, and during the imprisonment of the plaintiff cut off his queue, under the requirements of an ordinance of the city providing for the cutting or clipping of the hair of prisoners to a uniform length of one inch from the scalp. It was claimed on the part of the defendant that the ordinance was in the nature of a sanitary regulation, but the court found that its real purpose was directed against the Chinese, who regarded the deprivation of the queue as a mark of disgrace, and, according to their religious belief, attended with misfortune and suffering after death. The court held that this ordinance was in violation of the provisions of the fourteenth amendment to the constitution; that the equality of protection secured by this amendment to every one while within the United States implies not only that the courts of the country shall be open to him on the same terms as to all others, for the security of his person or property, the prevention or redress of wrongs and enforcement of contracts, but that no charges or burdens shall be laid upon him which are not equally borne by others, and that in the administration of criminal justice he shall suffer for his offenses no greater or different punishment. With equal force it may be said that he shall be subject to the same restrictions and conditions for the benefit of the public health. In the case of In re Lee Sing (C. C.) 43 Fed. 359, this court had before it an ordinance of the city and county of San Francisco prescribing a certain portion of the city for the residence of Chinese. It was objected there as here that the ordinance was a discrimination against the Chinese residents of the city, and contrary to the provisions of the fourteenth amendment to the constitution. Judge Sawyer, in commenting upon this ordinance, disposed of the question involved with this brief and pointed observation:

"That this ordinance is a direct violation of not only the express provisions of the constitution of the United States, in several particulars, but also of the express provisions of our several treaties with China and of the statutes of

the United States, is so obvious that I shall not waste more time or words in discussing the matter. To any reasonably intelligent and well-balanced mind, discussion or argument would be wholly unnecessary and superfluous. To those minds which are so constituted that the invalidity of this ordinance is not apparent upon inspection, and comparison with the provisions of the constitution, treaties, and laws cited, discussion or argument would be useless."

It was accordingly determined that the authority to pass the order was not within the legitimate police power of this state.

The observations of the court in these two cases are not entirely inappropriate to the regulations of the board of health and the instructions of the supervising surgeon general of the marine hospital service, offered by the defendants as authority for the regulations they are now engaged in enforcing against the Chinese inhabitants of this city. As said by the court of appeals of the state of New York in Re Jacobs, 98 N. Y. 108, speaking of the police power of the state:

"Under it the conduct of an individual and the use of property may be regulated so as to interfere to some extent with the freedom of the one and the enjoyment of the other; and in cases of great emergency, engendering overruling necessity, property may be taken or destroyed without compensation, and without what is commonly called 'due process of law.' The limit of the power cannot be accurately defined, and the courts have not been able or willing definitely to circumscribe it. But the power, however broad and extensive, is not above the constitution. When it speaks, its voice must be heeded. It furnishes the supreme law, the guide for the conduct of legislators, judges, and private persons; and, so far as it imposes restraints, the police power must be exercised in subordination thereto."

It follows from these considerations that the defendants have failed to justify their action in the premises, and that an injunction must issue as prayed for in the bill of complaint.

I am authorized to say that Judge HAWLEY, of Nevada, and Judge DE HAVEN, of California, who participated in the hearing of this cause, concur in this opinion.