JEW HO v. WILLIAMSON et al.

(Circuit Court, N. D. California. June 15, 1900.)

No. 12,940.

1. JURISDICTION OF FEDERAL COURTS—LIMITATION AS TO SUBJECT-MATTER IN CONTROVERSY.

Where a complainant invokes the jurisdiction of a federal court on the ground of diverse citizenship, the court has concurrent jurisdiction with a state court to determine all the questions involved in the case. The fact that the complainant raises a federal question, by asserting rights under the constitution of the United States, does not restrict the court in such case to a determination of that question alone.

2. HEALTH—VALIDITY OF REGULATIONS—POWER OF COURTS TO REVIEW.

A large discretion is necessarily vested in state or municipal authorities in determining what is a proper exercise of the police powers of the state for the protection of the public health, and what measures are necessary to meet particular conditions or emergencies; but their determination is not final, and is subject to supervision by the courts. They may not, under the guise of protecting the public, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful oc-

cupations, and whether they have done so in a particular case is a judicial question.

3. SAME—QUARANTINE. REGULATIONS—VALIDITY.

The purpose of quarantine regulations in case of the existence of a contagious or an infectious disease is to limit the spread of such disease to the fewest possible number of persons, by isolating the persons already affected or exposed from communication with all others so far as possible. Where not exceeding 9 persons in a city were supposed to have died from the bubonic plague, and no living persons were known to have contracted the disease, a regulation establishing a general quarantine district, embracing a territory covering 12 blocks, in which more than 10,000 persons resided, which prohibits persons from entering or leaving such district, but permits free intercourse between all persons within it, cannot be upheld as a reasonable regulation for preventing the spread of the disease, but its effect must necessarily be, if the disease exists within the district, to facilitate its spread among all the persons confined within its limits.

4. SAME—CONSTITUTIONALITY OF QUARANTINE REGULATIONS—DISCRIMINATING ENFORCEMENT.

A law or municipal regulation, though fair and undiscriminating on its face, may be rendered invalid on constitutional grounds by the manner in which it is administered by the public authorities charged with its execution; and a municipal regulation establishing a quarantine district is void, as in violation of the constitutional guaranty of the equal protection of the laws, where it is shown that it is enforced against all Chinese persons within the district, and against the buildings occupied by them, while it is not enforced against persons of other races, or against their residences, although situated within the limits of the district as defined in the regulation.

5. SAME—REVIEW BY COURTS—QUESTIONS OF FACT.

In a suit to enjoin the enforcement of quarantine regulations adopted because of the supposed existence of a contagious disease in the locality quarantined, the court will not, under ordinary circumstances, undertake to review the finding of the proper health authorities that the disease exists and the quarantine is necessary.

In Equity. On order to show cause why an injunction pendente lite should not issue.

Reddy, Campbell & Metson, Maguire & Gallagher, Samuel M. Shortridge, and John E. Bennett, for complainant.

J. J. Dunne, for defendants.

Before MORROW, Circuit Judge, and DE HAVEN, District Judge.

MORROW, Circuit Judge (orally). Having reached a conclusion as to the disposition to be made of the order to show cause in this case, I deem the circumstances of such a character as to justify an announcement of that conclusion at this time, without the delay incident to the preparation of a written opinion, which will be filed hereafter.

On the 28th day of May, 1900, the board of health of the city and county of San Francisco adopted the following resolution:

"Resolved, that it is the sense of this board that, in consequence of the discoveries in the district bounded by Broadway, Stockton, California, and Kearney streets, of nine deaths due to bubonic plague, which were verified by microscopical and animal inoculation tests, this board fears that there is still danger of the spread of this disease over a larger area, and therefore requests the board of supervisors to declare said district infected, and authorize the board of health to quarantine said district."

Thereafter, on the said 28th day of May, 1900, said resolution was filed in the office of the board of supervisors, and thereupon the board of supervisors passed the following ordinance:

"Be it ordained by the people of the city and county of San Francisco, as follows:

"Section 1. The board of health of this city and county is hereby authorized and empowered to quarantine persons, houses, places, and districts within this city and county, when in its judgment it is deemed necessary to prevent the spreading of contagious or infectious diseases."

This ordinance was approved by the mayor of the city, and thereafter transmitted to the board of health; and immediately thereafter, on the 29th day of May, 1900, at a special meeting of the board of health, a resolution was passed, which, after stating the passage by the board of supervisors of the foregoing ordinance, provided as follows:

"And whereas, after a careful and minute investigation had during a period of three months last past, and from the result of investigation made by Drs. Kellogg, bacteriologist to the board of health, Montgomery, of the University of California, Ophulf, of the Cooper Medical College, and J. J. Kinyoun, of the U. S. marine hospital service, each and all of whom have reported to this board that bubonic plague has existed in the district hereafter mentioned, and that nine deaths have occurred within said period within said district from said disease; and whereas, this board has reason to believe and does believe that danger does exist to the health of the citizens of the city and county of San Francisco by reason of the existence of germs of the said disease remaining in the district hereafter mentioned: Now, therefore, be it resolved: That the health officer be and is hereby instructed to place in quarantine until further notice that particular district of the city bounded north by Broadway, northeast by Montgomery avenue, east by Kearney, south by California, and west by Stockton streets; and that the chief of police is hereby requested to furnish such assistance as may be necessary to establish and maintain said quarantine. These lines may be modified by the health officer, or the chief of police, health board to be notified of the same. This resolution to take effect immediately."

Thereafter, on May 31, 1900, the board of supervisors passed another ordinance, which, after reciting the filing in the office of the resolution of the board of health of May 28, 1900, provided for the establishment of quarantine regulations in the district named, and directed the chief of police to furnish such assistance as might be necessary to establish and maintain this quarantine.

The complainant in this case, Jew Ho, alleges, among other things, that he resides at No. 926 Stockton street, within the limits of said quarantined district, and is engaged in the business of conducting a grocery store, as the proprietor and manager thereof, at his said place of residence, and that a great number of the patrons and customers of his said business reside at various places in the city and county of San Francisco outside the boundaries of said quarantined district, and are now, and ever since the 29th day of May, 1900, have been, prevented and prohibited by the defendants from visiting, patronizing, and dealing with the complainant in his said grocery store; that the complainant has been prevented and prohibited since the said 29th day of May, 1900, from selling his goods, wares, and merchandise, and from otherwise carrying on the business in which he is engaged. The complainant also alleges that although the said

resolutions of the board of supervisors and the defendant board of health are in general terms, and purport to impose the same restrictions, burdens, and limitations upon all persons within the said quarantined district, the said resolution is enforced against persons of the Chinese race and nationality only, and not against persons of other races. In this behalf it is alleged that all stores, residences, and other buildings within the quarantined district as described in the resolution, occupied by persons of races other than Chinese, are not subjected to any of the restrictions or limitations provided for by said resolution, whereas those occupied by Chinese are subjected to said restrictions. It is also alleged that wanton and willful discrimination against the Chinese residents of said district by the defendants is shown by the exclusion from the limits of said districts of all physicians employed by Chinese residents, and by the free permission to other residents of said district to select physicians of their own choice, and the permission to all such physicians to enter and depart from all buildings occupied by persons of races other than Chinese within said quarantined district. The complainant alleges that there is not now, and never has been, any case of bubonic plague within the limits of said quarantined district, nor any germs or bacteria of bubonic plague, and that other diseases caused the illness and death of the persons claimed by defendants to have died of the bubonic plague within the 30 days next preceding the filing of this complaint. It is further alleged that the defendants have failed and neglected to quarantine the houses alleged to be so infected from the remainder of said quarantined district, and have wholly failed and neglected to quarantine or otherwise isolate from the other residents of said quarantined district the persons alleged to have been so exposed to the danger of contagion, and therefore likely to transmit the germs of said bubonic plague to others, but have included in said quarantined district an unreasonably large and populous district, namely, 12 blocks, containing a population of more than 15,000 persons, thereby increasing rather than diminishing the danger of contagion and epidemic, both to the people of said district and to the people of San Francisco generally, if there should be any epidemic disease existing in said district; that within said quarantined district are several blocks in which it is not claimed or asserted by the defendants that any case of bubonic plague has existed for 40 days and more next preceding the filing of the complaint, and in which there is not now, and never has been, any danger of contagion or infection. The complainant alleges that he has never had or contracted said bubonic plague; that he has never been at any time exposed to the danger of contracting it, and has never been in any locality where said bubonic plague, or any germs or bacteria thereof, has or have existed; that the action of the defendants in confining and imprisoning the complainant and other Chinese residents within the limits of said quarantined district is a purely arbitrary, unreasonable, unwarranted, wrongful, and oppressive interference with the personal liberty of the complainant and the said Chinese residents, and with their right to the pursuit of their lawful business; that said resolution providing for the said quarantine, and designating said quarantine district, is

wholly unauthorized, invalid, and void, and contrary to the constitution and laws of the United States, and contrary to and in violation of the laws of the state of California; that it is not enforced against other residents of said district than those of the Chinese race; and that by its enforcement the said Chinese residents of said district are deprived of the equal protection of the laws, and of their rights and liberties under the constitution of the United States, and the laws and treaties passed and adopted in pursuance thereof. The complainant brings this suit in behalf of the Chinese residents of said quarantined district, to the number of 10,000 and upward, as well as in his own behalf. The prayer of the bill is that an injunction be granted, enjoining and restraining the defendants from interfering with the personal rights and privileges of the complainant.

Upon the filing of this bill of complaint, together with affidavits supporting the allegations therein contained, the court issued an order to the defendants to show cause why an injunction should not issue to restrain them from committing the acts and carrying into execution the threats set forth in the bill of complaint. To this order, return has been made by answer. In this answer the defendants allege the organization of the board of health, the provisions of the charter of San Francisco, the authority of the board of health, and the authority of the board of supervisors, as derived from the provisions of the charter. They allege that the board of supervisors have passed certain resolutions, to which I have already referred, and that they have acted in pursuance of the authority conferred by the charter, and that in establishing this quarantine district the defendants have been acting under the authority of the resolutions passed by the board of supervisors, and their own resolution in pursuance thereof. As the answer was originally framed, it denied that the complainant was within the quarantine limits as prescribed. But by oral amendment to the answer it is alleged that the particular place of residence of the complainant is included within the quarantined district. The defendants deny that they or any of their agents, in the enforcement of said quarantine regulations, exempt or relieve from all or any restrictions of quarantine all or any store or residence or other building whatever within said district. With regard to the averment that the complainant has never had or contracted the bubonic plague, the defendants state that they have not knowledge, information, or belief sufficient to enable them to answer, but they deny that the complainant has never at any time been exposed to the danger of contracting said bubonic plague, and that he has never been in any locality where said plague, or any germs or bacteria thereof, has or have existed. On the contrary, the defendants state their belief that the complainant is a Chinese person, and a resident within said quarantined district, where said plague has had its existence.

To this answer the complainant excepted orally on the ground that it did not respond to the equities of the bill, in this: that, with respect to the charges of detention and restriction of the complainant, the defendants' answer is that they have no information or belief with respect to the matters upon which the restraint is made or effected. It is contended that, the defendants having failed to answer fully

and directly as to the cause of restraining the complainant of his liberty, the bill must be taken as confessed. The bill of complaint is not a bill of discovery, and cannot be treated in that light. It is true that, after stating the matters of complaint, it concludes with the prayer that a supœna issue, and that the defendants be required to make full, true, direct, and perfect answer to the matters therein contained. But, under the equity practice, it is not required that the defendants in such a case shall do more than deny or answer the bill of complaint. They are not called upon to make a discovery, or to make specific disclosures concerning the matters therein contained. Moreover, the bill waived an answer under oath, but for the purpose of being used as an affidavit the answer is verified. In that form it has been introduced as a part of the return, in response to the order to show cause. There is some objection to the form of the answer as an affidavit, because, as an affidavit, it should be specific in reply to the matters charged in the bill of complaint. The equities of the bill are that the complainant is being unlawfully restrained of his liberty, and illegally deprived of the use of his property. The substantial answer to that charge is that the complainant is being restrained of his liberty and deprived of the use of his property by reason of certain quarantine regulations, and that, as to whether or not he has so exposed himself as to render himself personally subject to the restrictions of quarantine regulations, the defendants have no information or belief. Under the strict rules of equity practice, this answer, as an affidavit, would not be sufficient to meet the equities of the bill. But the court must take notice of the whole case, and it is evident therefrom that the answer of the defendants, averring that they have no knowledge or information or belief concerning the exposure of this complainant to this disease, is a difficulty or weakness that is inherent in the case, and not alone in the pleadings. We find from other portions of the pleadings that there are in this quarantined district some 10,000 people or more. It is quite likely that, with respect to such a large number, in a district of that character, there would be a great number, and perhaps the great majority, concerning which the defendants would have no knowledge, information, or belief. They could have no information concerning individuals upon which to found any belief, and therefore they have made denial in accordance with the circumstances of the case. Considering the pleading as dealing with a single case or a single fact, it would, of course, be insufficient. But, when it comes to dealing with a large population,—10,000 or more,—the court must recognize that the lack of information on the part of the defendants is an infirmity that belongs to their case on the merits. The court will therefore not sustain the objection to the answer upon the ground that there is a defect in the showing made in the answer, but will consider that the case is inherently weak in this respect upon the actual facts alleged.

The next objection that has been interposed by the complainant to the sufficiency of the answer is that it does not appear therefrom that the ordinance has been passed with the formality required by the charter. I have examined the evidence that has been furnished to the court by these affidavits, and I am unable to find any evidence

sufficient to justify the court in holding that this ordinance has not been passed with the requisite formalities. It may be that the requirements of the charter have not been complied with in every particular in the enactment of the ordinance upon which the complaint is founded. But that fact does not appear from the evidence submitted to the court, and the allegations are such that the court must indulge the presumption that the ordinance has been passed with the requisite formalities.

The next objection interposed on the part of the defendants is that this court has no authority to examine into the questions in controversy; that, it appearing from this return that a duly-constituted department of the municipality of San Francisco has made inquiry as to the situation attending an alleged epidemic of a contagious disease, and has adopted resolutions and taken such steps as it deemed necessary, such action is an adjudication on the part of a department having exclusive jurisdiction and authority over the subject, and this court has no jurisdiction to inquire into the reasonableness or propriety of the acts of the defendants. That objection I understand counsel to make not only to this court as a court of general jurisdiction, but also to this court as a court having jurisdiction to determine federal questions. I will consider the federal aspect of the objection first, namely, the jurisdiction of this court to determine other than federal questions.

The complainant alleges that he is an alien. He invokes the jurisdiction of this court on the ground of diverse citizenship. Where a cause is brought into this court upon that ground, the court has a concurrent jurisdiction with the state court to determine all the questions involved in the case. It has the same jurisdiction as the superior court of the state. It may inquire into the regularity and legality of proceedings of a municipality, or in any locality, precisely as would a state court. The cases to which counsel for defendants referred, wherein the federal court denied itself the right to inquire into the legislation of states or municipalities, have arisen where the jurisdiction of the federal court has been invoked on the sole ground that the controversy involved a federal question. In such cases the complainant states the federal question as the matter to be determined. If, for instance, in this case a citizen of the state of California should come into this court and invoke its jurisdiction on the ground that this action of the board of supervisors involved a federal question, and that it was contrary to the fourteenth amendment of the constitution, an allegation of that character would state the ground of jurisdiction and subject of controversy, and it would be the only question this court would be called upon to examine. The court would not, in such a case, enter into the question of whether or not the action of the board of supervisors was in conformity with the constitution of the state, or whether it was beyond the municipal powers of the city under its charter. All such questions would in that case be foreign to the investigation, and the court would be confined to the question as to whether or not it was contrary to the provisions of the fourteenth amendment to the constitution of the United States. But in the case at bar the complainant comes into court as an alien, and

invokes the jurisdiction of the court on the ground of diverse citizenship, and presents also the federal question. The court is therefore not restricted in its jurisdiction to the federal question, but may inquire into all matters relating to the legality of the restraint imposed upon the complainant.

It is next contended that the acts of the defendants in establishing a quarantine district in San Francisco are authorized by the general police power of the state, intrusted to the city of San Francisco. The defendants rely upon a number of cases in support of this asserted jurisdiction and authority,—among others, the case of Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205. In that case it appears that the constitution of Kansas provided "that the manufacture and sale of intoxicating liquors shall be forever prohibited in this state, except for medical, scientific and mechanical purposes." The legislature of the state enacted a statute to carry this constitutional provision into effect. Mugler, the proprietor of a brewery, was indicted in one of the courts of the state for violation of this statute, and was tried and convicted and sentenced to pay a fine. The case was appealed to the supreme court of the state, and there affirmed. A writ of error took the case to the supreme court of the United States. The question was whether the prohibition by the state of Kansas, in its constitution and laws, of the manufacture or sale within the limits of the state of intoxicating liquors for general use in the state as a beverage, was fairly adapted to the end of protecting the community against the evils which result from excessive use of ardent spirits, and whether it was subject to the objection that under the guise of police regulations the state was aiming to deprive the citizen of his constitutional rights. The court, in passing upon this question, said:

"Power to determine such question, so as to bind all, must exist somewhere; else, society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the 'police powers' of the state, and to determine primarily what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety."

But the court did not stop with this declaration. It went further, and explained that the legislative authority was subject to limitations, and that it was for the courts to determine whether such limitations were exceeded when such legislative acts were called in question. The court said:

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the state. There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute (Sinking-Fund Cases, 99 U. S. 700, 718, 25 L. Ed. 496), the courts must obey the constitution, rather than the lawmaking department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. 'To what purpose,' it was said in Marbury v. Madison, 1 Cranch, 137, 176, 2 L. Ed. 60, 'are powers limited, and to what purpose is that limitation committed to writing, if those limits may at any time be passed by those intended to be restrained?'

103 F.—2

The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.' The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution."

And in the case of Chy Lung v. Freeman, 92 U. S. 275, 280, 23 L. Ed. 550, the same court, speaking of the right of a state, in the absence of legislation by congress, to protect herself by necessary and proper laws, said:

"Such a right can only arise from a vital necessity for its exercise, and cannot be carried beyond the scope of that necessity."

In Ex parte Whitwell, 98 Cal. 73, 78, 32 Pac. 870, 19 L. R. A. 727, the petitioner was imprisoned by the sheriff of San Mateo county upon a charge of maintaining within the boundaries of that county a hospital for the treatment of insane persons, without having procured a license so to do, as required by an ordinance adopted by the board of supervisors of that county March 16, 1892. The ordinance referred to purported to be one—

"To license for purpose of regulation and revenue, the business of keeping * * * within the county of San Mateo * * * hospitals, asylums, homes, retreats or places for the care or treatment of insane persons or persons of unsound mind, or inebriates, or persons affected by or suffering from any mental or nervous disease, or who are suffering from the effects of the excessive use of alcoholic liquors."

The ordinance made it unlawful to maintain within the county of San Mateo any hospital, asylum, or place for the care or treatment, for reward, of any insane person, or persons belonging to either of the classes mentioned in the title of the ordinance, unless the keeper of such hospital or asylum should have first procured a license therefor. The ordinance provided, however, that no license should be granted unless the board was satisfied that the building was fireproof, by reason of being constructed of brick and iron or stone and iron; that the building should not be more than two stories in height, and that the same, and the land used in connection therewith, or such part of said land as any of the patients were to have access to, was surrounded by a brick or stone wall not less than 18 inches in thickness and not less than 12 feet in height, and in which wall there was to be one opening, which opening should be closed by a solid iron door, so constructed and fitted into said wall as that the same might be securely fastened by a combination lock, and said door furnished with a combination lock. The petitioner was a physician and surgeon, and directed his attention to the treatment of persons afflicted as described in the ordinance. He had purchased a tract of land in San Mateo county, and erected a building thereon, prior to the passage of this ordinance, for the accommodation of such persons during treatment, but this building was not of the character designated and required by the ordinance. It was claimed by the petitioner that the ordinance imposed unreasonable restrictions upon his right to prose-

cute a lawful business and to devote his property to a lawful use, and that such provisions were in conflict with the constitution of the United States and of the state of California, and for that reason void. Upon the other hand, it was contended that the ordinance was a police regulation, and that the court was not authorized to declare it invalid because in its judgment the ordinance might be deemed unreasonable. Discussing this question, the supreme court, speaking through Mr. Justice De Haven, said:

"The police power—the power to make laws to secure the comfort, convenience, peace, and health of the community—is an extensive one, and in its exercise a very wide discretion as to what is needful or proper for that purpose is necessarily committed to the legislative body in which the power to make such laws is vested. Ex parte Tuttle, 91 Cal. 589, 27 Pac. 933. But it is not true that, when this power is exerted for the purpose of regulating a business or occupation which in itself is recognized as innocent and useful to the community, the legislature is the exclusive judge as to what is a reasonable and just restraint upon the constitutional right of the citizen to pursue such business or profession. As the right of the citizen to engage in such a business or follow such a profession is protected by the constitution, it is always a judicial question whether any particular regulation of such right is a valid exercise of legislative power. Tied. Lim. §§ 85, 194; Pennsylvania Railroad Co. v. Mayor, etc., of Jersey City, 47 N. J. Law, 286; Com. v. Robertson, 5 Cush. 438; Austin v. Murray, 16 Pick. 121. * * * And this necessary limitation upon the power of the legislature to interfere with the fundamental rights of the citizen in the enactment of police regulations was recognized by this court in Ex parte Sing Lee. 96 Cal. 354, 31 Pac. 245, 24 L. R. A. 195, in which case we said that the personal liberty of the citizen and his rights of property cannot be invaded under the disguise of a police regulation. This power of the courts, however, to declare invalid what they may deem an unreasonable legislative regulation of a business or occupation which the citizen has the constitutional right to follow, although undoubted, must, from the nature of the power, be exercised with the utmost caution, and only when it is clear that the ordinance or law so declared void passes entirely beyond the limits which bound the police power, and infringes upon rights secured by the fundamental law. The true rule upon this subject is thus expressed by the supreme court of the state of Missouri in the case of City of St. Louis v. Weber, 44 Mo. 547: 'In assuming, however, the right to judge of the reasonableness of an exercise of corporate power, courts will not look closely into mere matters of judgment, where there may be a reasonable difference of opinion. It is not to be expected that every power will always be exercised with the highest discretion, and when it is plainly granted a clear case should be made to authorize an interference upon the ground of unreasonableness.' "

It was held that the ordinance was unreasonable and void, and could not be sustained under the police power of the state.

In the case of Health Department of City of New York v. Rector, etc., of Trinity Church, 145 N. Y. 32, 39 N. E. 833, the question was with respect to the regulations concerning the introduction of water into tenement houses. The decision is by Judge Peckham, now of the supreme court of the United States. The ordinance was sustained by the court, but in doing so the court declared very clearly the limitation upon the police power of the state, as follows:

"It has frequently been said that it is difficult to give any exact definition which shall properly limit and describe such power. It must be exercised subject to the provisions of both the federal and state constitutions, and the law passed in the exercise of such power must tend, in a degree that is perceptible and clear, towards the preservation of the lives, the health, the morals, or the welfare of the community, as those words have been used and construed in many cases heretofore decided,"—citing a number of cases.

In the case of In re Smith, 146 N. Y. 68, 40 N. E. 497, 28 L. R. A. 820, there was involved the quarantine of a house in which a person was charged with being exposed to the smallpox. There the court said:

"I think no one will dispute the right of the legislature to enact such measures as will protect all persons from the impending calamity of a pestilence, and to vest in local authorities such comprehensive powers as will enable them to act competently and effectively. That those powers would be conferred without regulating or controlling their exercise is not to be supposed, and the legislature has not relieved officials from the responsibility of showing that the exercise of their powers was justified by the facts of the case. The question here is not whether the legislature had the power to enact the provisions of section 24 of the health law, but whether the respondent has shown that a state of facts existed, warranting the exercise of the extraordinary authority conferred upon him. Like all enactments which may affect the liberty of the person, this one must be construed strictly, with the saving consideration, however, that, as the legislature contemplated an extraordinary and dangerous emergency for the exercise of the power conferred, some latitude of a reasonable discretion is to be allowed to the local authorities upon the facts of a case."

The case of Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385, had relation to a regulation concerning the fisheries. The court said with respect to the police power of the state:

"The extent and limits of what is known as the 'police power' have been a fruitful subject of discussion in the appellate courts of nearly every state in the Union. It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement by summary proceedings of whatever may be regarded as a public nuisance. Under this power it has been held that the state may order the destruction of a house falling to decay, or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and other means of public conveyance, and of interment in burial grounds; the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane or those afflicted with contagious diseases; the restraint of vagrants, beggars, and habitual drunkards; the suppression of obscene publications and houses of ill fame; and the prohibition of gambling houses and places where intoxicating liquors are sold. Beyond this, however, the state may interfere wherever the public interests demand it; and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests. Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923; Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346. To justify the state in thus interposing its authority in behalf of the public, it must appear—First, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts."

This I find to be the law as established in the various states of the Union, as well as by the supreme court of the United States. These cases determine that this is a subject for judicial investigation, and the question therefore arises as to whether or not the quarantine established by the defendants in this case is reasonable, and whether

it is necessary, under the circumstances of this case. As I had occasion to say in the former case (Wong Wai v. Williamson [C. C.] 103 Fed. 1), this court will, of course, uphold any reasonable regulation that may be imposed for the purpose of protecting the people of the city from the invasion of epidemic disease. In the presence of a great calamity, the court will go to the greatest extent, and give the widest discretion, in construing the regulations that may be adopted by the board of health or the board of supervisors. But is the regulation in this case a reasonable one? Is it a proper regulation, directed to accomplish the purpose that appears to have been in view? That is a question for this court to determine.

Affidavits have been filed on behalf of the complainant in this case,—one of them by Dr. J. I. Stephen, to which I will refer. Dr. Stephen says:

"I am a regular physician and surgeon, licensed to practice medicine and surgery in the state of California. I obtained my medical education and diplomas in London, England, and in Dublin, Ireland. I have been in the active practice of medicine and surgery for the past twenty years,—for several years, in London, England, where I held various official positions, such as surgeon to the police, medical officer of health, parish medical officer, and public vaccinator, and for the past thirteen years in the state of California. I have given much time and study to the literature of the bubonic plague, and am familiar with the nature, symptoms, and characteristics of said disease. * * * The bubonic plague is a virulent, contagious disease, and under favorable conditions spreads with great rapidity. Those conditions are overcrowding and unsanitary surroundings. The above defendants claim to have discovered since the said month of March, 1900, at varying intervals, seven, eight, or nine dead bodies of Chinese whose death said defendants attribute to said bubonic plague. Bearing in mind the nature, symptoms, and characteristics of said disease, and the conditions generally prevailing in said district known as 'Chinatown,' and now under quarantine, it is impossible to believe that these persons died of such disease. If said disease had existed in the form and under the conditions claimed by said defendants, hundreds, perhaps thousands, of cases would have developed, and many deaths ensued therefrom; for I further aver that no proper or scientific precautions have been taken by said defendants to prevent the spread of said disease. Assuming that the said deceased persons died of said disease, it is my opinion, and I further aver, that said defendants have proceeded from erroneous theories to still more erroneous and unscientific practices and methods of dealing with the same; for, instead of quarantining the supposedly infected rooms or houses in which said deceased persons lived and died, and the persons who had been brought in contact with and been directly exposed to said disease, said defendants have quarantined, and are now maintaining a quarantine over, a large area of territory, and indiscriminately confining therein between ten and twenty thousand people, thereby exposing, and they are now exposing, to the infection of the said disease said large number of persons. Notwithstanding said lack of proper quarantining and said exposure of over ten to twenty thousand persons to infection during a period commencing in the early part of said month of March, 1900, there has not been found a single living case of said disease."

I read that affidavit for the purpose of showing the method adopted by the board of health for the suppressing of this so-called plague, namely, the quarantining of a large territory in the city of San Francisco,—some 10 or 12 blocks,—in which there are located about 10,000 people. It must necessarily follow that, where so many have been quarantined, the danger of the spread of the disease would not diminish. The purpose of quarantine and health laws and regulations with respect to contagious and infectious diseases is directed prima-

rily to preventing the spread of such diseases among the inhabitants of localities. In this respect these laws and regulations come under the police power of the state, and may be enforced by quarantine and health officers, in the exercise of a large discretion, as circumstances may require. The more densely populated the community, the greater danger there is that the disease will spread, and hence the necessity for effectual methods of protection. To accomplish this purpose, persons afflicted with such diseases are confined to their own domiciles until they have so far recovered as not to be liable to communicate the disease to others. The same restriction is imposed upon victims of such diseases found traveling. The object of all such rules and regulations is to confine the disease to the smallest possible number of people; and hence when a vessel in a harbor, a car on a railroad, or a house on land, is found occupied by persons afflicted with such a disease, the vessel, the car, or the house, as the case may be, is cut off from all communication with the inhabitants of adjoining houses or contiguous territory, that the spread of the disease may be arrested at once and confined to the least possible territory. This is a system of quarantine that is well recognized in all communities, and is provided by the laws of the various states and municipalities: That, when a contagious or infectious disease breaks out in a place, they quarantine the house or houses first; the purpose being to restrict the disease to the smallest number possible, and that it may not spread to other people in the same locality. It must necessarily follow that, if a large section or a large territory is quarantined, intercommunication of the people within that territory will rather tend to spread the disease than to restrict it. If you place 10,000 persons in one territory, and confine them there, as they have been in prisons and other places, the spread of disease, of course, becomes increased, and the danger of such spread of disease is increased, sometimes in an alarming degree, because it is the constant communication of people that are so restrained or imprisoned that causes the spread of the disease. If we are to suppose that this bubonic plague has existed in San Francisco since the 6th day of March, and that there has been danger of its spreading over the city, the most dangerous thing that could have been done was to quarantine the whole city, as to the Chinese, as was substantially done in the first instance. The next most dangerous thing to do was to quarantine any considerable portion of the city, and not restrict intercommunication within the quarantined district. The quarantined district comprises 12 blocks. It is not claimed that in all the 12 blocks of the quarantined district the disease has been discovered. There are, I believe, 7 or 8 blocks in which it is claimed that deaths have occurred on account of what is said to be this disease. In 2 or 3 blocks it has not appeared at all. Yet this quarantine has been thrown around the entire district. The people therein obtain their food and other supplies, and communicate freely with each other in all their affairs. They are permitted to go from a place where it is said that the disease has appeared, freely among the other 10,000 people in that district. It would necessarily follow that, if the disease is there, every facility has been offered by this species of quarantine to enlarge its sphere and increase its danger

and its destructive force. I need not enlarge upon this feature of the case. It is set forth fully by the affidavits in the case, by the original complaint, and by the opinions of the physicians who have furnished evidence to the court. The court cannot ignore this evidence and the condition it describes. The court cannot but see the practical question that is presented to it as to the ineffectiveness of this method of quarantine against such a disease as this. So, upon that ground, the court must hold that this quarantine is not a reasonable regulation to accomplish the purposes sought. It is not in harmony with the declared purpose of the board of health or of the board of supervisors.

But there is still another feature of this case that has been called to the attention of the court, and that is its discriminating character; that is to say, it is said that this quarantine discriminates against the Chinese population of this city, and in favor of the people of other races. Attention is called to the fact that, while the board of supervisors has quarantined a district bounded by streets, the operation of the quarantine is such as to run along in the rear of certain houses, and that certain houses are excluded, while others are included; that, for instance, upon Stockton street, in the block numbered from 900 to 1,000, there are two places belonging to persons of another race, and these persons and places are excluded from this quarantine, although the Chinese similarly situated are included, and although the quarantine, in terms, is imposed upon all the persons within the blocks bounded by such streets. The evidence here is clear that this is made to operate against the Chinese population only, and the reason given for it is that the Chinese may communicate the disease from one to the other. That explanation, in the judgment of the court, is not sufficient. It is, in effect, a discrimination, and it is the discrimination that has been frequently called to the attention of the federal courts where matters of this character have arisen with respect to Chinese. The case of Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, arose in this state, out of the operation of an ordinance of this city respecting Chinese laundries. The supreme court in that case had been discussing cases where there were simply opportunities for discrimination, not an actual discrimination. The court points this out as not being a case where there was not merely opportunity for discrimination, but where there was an actual discrimination. The court says:

"In the present cases we are not obliged to reason from the probable to the actual, and pass upon the validity of the ordinances complained of, as tried merely by the opportunities which their terms afford of unequal and unjust discrimination in their administration; for the cases present the ordinances in actual operation, and the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the fourteenth amendment to the constitution of the United States. Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations, between persons in similar circumstances, material

to their rights, the denial of equal justice is still within the prohibition of the constitution. This principle of interpretation has been sanctioned by this court in Henderson v. Mayor of City of New York, 92 U. S. 259, 23 L. Ed. 543; Chy Lung v. Freeman, 92 U. S. 275, 23 L. Ed. 550; Ex parte Virginia, 100 U. S. 339, 25 L. Ed. 676; Neal v. Delaware, 103 U. S. 370, 26 L. Ed. 567; and Soon Hing v. Crowley, 113 U. S. 703, 5 Sup. Ct. 730, 28 L. Ed. 1145."

In the case at bar, assuming that the board of supervisors had just grounds for quarantining the district which has been described, it seems that the board of health, in executing the ordinance, left out certain persons, members of races other than Chinese. This is precisely the point noticed by the supreme court of the United States, namely, the administration of a law "with an evil eye and an unequal hand." Wherever the courts of the United States have found such an administration of the law, although it may be, upon the face of the act or of the ordinance, such a lack of discrimination as to otherwise justify the ordinance or the law, still, if the court finds that, in its practical operation,—in its enforcement by the state or the municipality,—there is that opportunity, and that it is the purpose to enforce it "with an evil eye and an unequal hand," then it is the duty of the court to interpose, and to declare the ordinance discriminating in its character, and void under the constitution of the United States. Therefore the court must hold that this ordinance is invalid and cannot be maintained, that it is contrary to the provisions of the fourteenth amendment of the constitution of the United States, and that the board of health has no authority or right to enforce any ordinance in this city that shall discriminate against any class of persons in favor of another.

There is one other feature of this case, and that is as to whether or not the bubonic plague has existed in this city, and whether it does now exist. The complainant alleges in his bill of complaint that it does not exist in San Francisco or in this quarantined district, and the bill is supported by the affidavits of a number of reputable physicians. Dr. J. I. Stephen says in this regard:

"I am the regularly appointed physician of the Chinese Empire Reform Association, which numbers several thousand Chinese residents in the state of California, and in the performance of my professional duties have made frequent visits to that portion of said city and county commonly known as 'Chinatown,' and which is now under quarantine by order of the above defendants, and am well acquainted with the sanitary condition of said district, and with the people who reside therein. I am aware of the allegation of the above defendants that bubonic plague has existed within said quarantined district since the month of March, 1900, and am of the opinion, based upon my knowledge of said disease, and familiarity with said district and the people residing therein, that said allegation is based upon totally inadequate evidence. The said defendants have formed their diagnosis upon the alleged recognition of bacilli found in the tissues of certain deceased Chinese persons, and upon incomplete animal experimentations, and have entirely ignored the clinical history of the disease. I further state that the post mortem appearances that the said defendants claim to have found in their autopsies of said deceased persons, and which said defendants claim to be diagnostic of the presence of said disease, are found in many other diseases. I would further state that the said Chinese are particularly subject to enlarged glands due to syphilis and scrofula, and that the enlarged glands which are claimed to have been found in said deceased persons are not due to bubonic plague, but to the constitutional effects of either syphilis or scrofula. From these reasons, and facts hereinbefore stated, I draw the conclusion, and therefore aver, that said disease has not at

any time since or during the said month of March existed, and that it does not now exist, within said district under quarantine, or elsewhere in the city and county of San Francisco."

Dr. E. S. Pillsbury, professor of pathology and bacteriology at the College of Physicians and Surgeons, states that he personally examined and diagnosed all bodies of deceased persons dying within the quarantined district between May 30th and June 7th, save one, and that he does not believe the bubonic plague now exists within the said district, or that it has existed there within the last four months. Dr. H. D'Arcy Power, employed by the Chinese Six Companies, visited the quarantined district during the 30th and 31st days of May and the 1st and 2d days of June, and saw all the sick persons and dead bodies then in said district. He states that none of the cases visited by him was a case of bubonic plague, and that he does not believe at the time of his visits there was a case of bubonic plague in said district, nor that one has since occurred. Dr. D. A. Hodghead testifies to the same effect. Dr. George L. Fitch states that he attended one of the Chinese persons said by the board of health to have died of the bubonic plague, but that in his opinion the said Chinese died of pneumonia. Dr. Fitch states that, from his knowledge, he does not believe there are now any cases of bubonic plague within the district of Chinatown. Dr. E. C. Atterbury was with him on this case, and gives the same testimony. Dr. Lydia J. Wyckoff states that she has practiced her profession during periods of epidemics of bubonic plague in other countries, and, from her knowledge of said disease, she is of the opinion that the cases which the board of health regard as having been bubonic plague were not in fact cases of true bubonic plague. Dr. George A. Cable testifies that he attended three of the cases in the quarantined district now suspicioned by the board of health to have been bubonic plague; that such cases were not, in his opinion, bubonic plague; and that, during the whole period of his practice within said district, he has never at any time seen a case resembling bubonic plague. He states it as his opinion that bubonic plague does not now exist, nor has it ever existed, within said Chinatown. Dr. Minnie G. Worley states that she attended the case of a Chinese girl on May 11th, who subsequently died, and which case the board of health have declared was bubonic plague; that she diagnosed the case as typhoid fever; that no other person, to her knowledge, has contracted the bubonic plague or any disease from the said case, and, in affiant's opinion, the girl did not die from bubonic plague.

The evidence of Dr. Stephen and these other physicians shows that, at most, there have been 11 deaths in the quarantined district which on autopsy have disclosed some of the symptoms of the bubonic plague. But there has been no living case under the examination of the physicians from which a clinical history has been obtained, and it does not appear that there has been any transmission of the disease from any of those who have died. From all of which the court infers that the suspected cases were not contagious or infectious, or, if contagious and infectious, they were but sporadic in their nature, and had no tendency to spread or disseminate in the city. If it were within the province of this court to determine this issue, I think, upon

such testimony as that given by these physicians, I should be compelled to hold that the plague did not exist and has not existed in San Francisco. But this testimony is contradicted by the physicians of the board of health. They have furnished the testimony of reputable physicians that the bubonic plague has existed, and that the danger of its development does exist. In the face of such testimony the court does not feel authorized to render a judicial opinion as to whether or not the plague exists or has existed in this city. Indeed, that is one of the questions that courts, under ordinary circumstances, are disposed to leave to boards of health to determine, upon such evidence as their professional skill deems satisfactory. If they believe, or if they have even a suspicion, that there is an infectious or contagious disease existing within the city, it is unquestionably the duty of such boards to act and protect the city against it, not to wait always until the matter shall be established to the satisfaction of all the physicians or all the persons who may examine into the question. It is the duty of the court to leave such question to be determined primarily by the authority competent for that purpose. So that in this case the court does not feel at liberty to decide this question, although, as I have said, personally the evidence in this case seems to be sufficient to establish the fact that the bubonic plague has not existed, and does not now exist, in San Francisco.

It follows from the remarks that I have made that this quarantine cannot be continued, by reason of the fact that it is unreasonable, unjust, and oppressive, and therefore contrary to the laws limiting the police powers of the state and municipality in such matters; and, second, that it is discriminating in its character, and is contrary to the provisions of the fourteenth amendment of the constitution of the United States. The counsel for complainant will prepare an injunction, which shall, however, permit the board to maintain a quarantine around such places as it may have reason to believe are infected by contagious or infectious diseases, but that the general quarantine of the whole district must not be continued, and that the people residing in that district, so far as they have been restricted or limited in their persons and their business, have that limitation and restraint removed. With respect to the examination of persons who have died, I have already issued a preliminary restraining order preventing the defendants from interfering with physicians attending upon persons claimed to be afflicted with this disease. It will result, probably, if other suspicious cases are found within San Francisco, in a quarantine immediately being imposed upon the proper locality or house or building. In such a case the physician who has been attending the person afflicted should be permitted to continue to attend, and, in case of a death, such physician as may be selected by the Chinese association mentioned in this case shall have a right to attend any autopsy that may be made. But, as before indicated to counsel, that privilege should not be abused. There should not be an effort on the part of everybody, out of curiosity and otherwise, to attend upon these autopsies. There should be some reasonable limit to such privilege. The board of health is charged with the responsibility of maintaining regulations for the protection of the health of

this city, and there should be no unreasonable interference with its authority in matters of that kind. The board will have the right to maintain special quarantines in places suspected of having disease, and it has the right to enforce such regulations as it may deem proper, in order to secure an absolute exclusion of such places from the remainder of the community.

I am authorized to say that Judge DE HAVEN concurs in the conclusions here reached.