*Liberian Community Association v. Lamont*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2017

(Argued: February 8, 2018          Decided: August 14, 2020)

No. 17-1558

_____

LIBERIAN COMMUNITY ASSOCIATION OF CONNECTICUT, on behalf of themselves and those similarly situated, LOUISE MENSAH-SIEH, on behalf of herself and her minor children B.D. and S.N., on behalf of themselves and those similarly situated, VICTOR SIEH, on behalf of themselves and those similarly situated, EMMANUEL KAMARA, on behalf of themselves and those similarly situated, ASSUNTA NIMLEY-PHILLIPS, on behalf of themselves and those similarly situated, LAURA SKRIP, on behalf of themselves and those similarly situated, RYAN BOYKO, on behalf of themselves and those similarly situated, ESTHER YALARTAI, on behalf of themselves and those similarly situated, BISHOP HARMON YALARTAI, on behalf of themselves and those similarly situated,

*Plaintiffs-Appellants*,

-v.-

NED LAMONT, Governor, DEIDRE S. GIFFORD, Acting Commissioner of Public Health, JEWEL MULLEN, Former Commissioner of Public Health,

*Defendants-Appellees*.[1]

---

[1] The Clerk of Court is respectfully directed to amend the caption as set forth above.

_____

Before:     WINTER, LIVINGSTON, and CHIN, *Circuit Judges*.

Plaintiffs-Appellants Ryan Boyko, Laura Skrip, the Mensah-Sieh family, Assunta Nimley-Phillips, Bishop Harmon Yalartai, Esther Yalartai, and the Liberian Community Association of Connecticut ("Appellants") appeal from a judgment of the United States District Court for the District of Connecticut (Covello, *J.*) denying their motion for class certification and dismissing their suit for lack of standing and based on qualified immunity.   Appellants challenged the quarantine decisions of certain Connecticut state officials in response to an Ebola epidemic in West Africa.   On appeal, they primarily argue that (1) they suffered actual or imminent injuries that create standing to seek prospective relief to avert allegedly unconstitutional future quarantines; (2) clearly established law required that any quarantine imposed be medically necessary and comport with certain procedural safeguards; and (3) their class is sufficiently numerous to merit certification.   We conclude that (1) the district court properly deemed their injuries too speculative to support standing, and (2) the law surrounding quarantines was not clearly established such that a state official may be held liable for the actions taken here.   We do not reach the class certification issue because it is mooted by our conclusion as to standing.   Accordingly, the judgment of the district court is AFFIRMED and REMANDED with instructions to amend the judgment to clarify that the state law claims were dismissed without prejudice.

Judge CHIN concurs in part and dissents in part in a separate opinion.

FOR PLAINTIFFS-APPELLANTS:     D'LANEY GIELOW (Michael J. Wishnie, Amy Kapczynski, Dana Bolger, Kyle Edwards, Megha Ram, *on the briefs*), Jerome N. Frank Legal Services Organization, Yale Law School, New Haven, CT.

JEREMY ERSHOW (Susan J. Kohlmann, Jeremy M. Creelan, Irene M. Ten Cate, *on the briefs*), Jenner & Block LLP, New York, NY.

2

(Robert M. Palumbos, Duane Morris LLP, Philadelphia, PA, *for* George J. Annas, Jennifer Bard, Leo Beletsky, Micah Berman, Scott Burris, Erwin Chemerinsky, Linda C. Fentiman, Lance Gable, Brandon Garrett, Lawrence O. Gostin, Jonathan Hafetz, Helen Hershkoff, Peter D. Jacobson, Jonathan Kahn, Renee M. Landers, Sylvia A. Law, Jenny S. Martinez, Seema Mohapatra, Burt Neuborne, Wendy Parmet, Aziz Rana, Judith Resnik, Kermit Roosevelt, Charity Scott, and Stephen I. Vladeck, as *amici curiae*)

(Kim E. Rinehart, Wiggin and Dana, LLP, New Haven, CT, *for* Yale New Haven Health Services Corporation, Hartford Hospital, The Hospital of Central Connecticut, Backus Hospitals, MidState Medical Center, Windham Hospital, Saint Francis Hospital and Medical Center, Johnson Memorial Hospital, Saint Mary's Hospital, Bristol Hospital, and Western Connecticut Health Network, Inc., as *amici curiae*)

(Dan Barrett, ACLU Foundation of Connecticut, Hartford, CT, and Esha Bhandari, American Civil Liberties Union Foundation, New York, NY, *for* American Civil Liberties Union, American Civil Liberties Union of Connecticut, Doctors Without Borders/ Medécins Sans Frontières USA as *amici curiae*)

(Ann O'Leary and Kathleen Hartnett, Boies Schiller Flexner LLP, Palo Alto, CA, and

3

David A. Barrett and Yotam Barkai, Boies Schiller Flexner LLP, New York, NY, *for* Mark Barnes, Leana Wen, and Jeffrey Duchin as *amici curiae*)

FOR DEFENDANTS-APPELLEES:                ROBERT J. DEICHERT, Assistant Attorney General, *for* George Jepsen, Attorney General, Hartford, CT.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This case arises out of the Ebola epidemic that ravaged West Africa between 2014 and 2016. In response to the epidemic, then-Governor Dannel Malloy declared a public health emergency in the State of Connecticut. The declaration authorized Dr. Jewel Mullen, then-Commissioner of Public Health, to isolate or quarantine individuals whom she believed had been exposed to or could transmit the Ebola virus. She ordered twenty-one-day quarantines for two Ph.D. candidates—Ryan Boyko and Laura Skrip—and six members of the Mensah-Sieh family who had recently emigrated from Liberia. None of the quarantined individuals were infected with Ebola.

Boyko, Skrip, the Mensah-Siehs, Assunta Nimley-Phillips, Bishop Harmon Yalartai, Esther Yalartai, and the Liberian Community Association of Connecticut (collectively, "Appellants") filed a putative class-action suit in the United States District Court for the District of Connecticut (Covello, *J.*) challenging the state

4

officials' actions.[2]   They primarily alleged violations of their substantive and procedural due process rights and the Fourth Amendment.   The defendants—the Governor and Commissioners of Public Health—moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b).   As to these constitutional claims, the district court dismissed the claims for injunctive relief under Rule 12(b)(1), for lack of standing, and dismissed the claims for damages under Rule 12(b)(6), on the basis of Dr. Mullen's assertion of qualified immunity.[3]   The court also denied the motion for class certification.   We agree with the conclusions reached by the district court as to standing and qualified immunity and need not reach the issue of class certification.   Accordingly, we AFFIRM the judgment but REMAND with instructions to the district court that the judgment be amended to reflect that the state law claims were dismissed without prejudice.

---

[2] Dr. Mary Jean O was also a plaintiff but moved before this Court on May 21, 2020, for an order dismissing this appeal as to her. We granted the motion on June 23, 2020.

[3] As set forth herein, the plaintiffs also raised certain federal statutory claims that were similarly dismissed and that are not pursued on appeal.   The district court declined to exercise supplemental jurisdiction as to additional claims raised under Connecticut state law, thus dismissing them without prejudice.   *See infra* Background, Section II.

# BACKGROUND

## I. Factual Background[4]

### A. The 2014 Ebola Outbreak

Ebola "is spread through direct physical contact with the bodily fluids of a symptomatic person, the body of a person who has died from Ebola, or objects contaminated with the virus, such as used needles." J.A. 26.[5] Once an individual has contracted the virus, "[t]he incubation period (the time from infection to onset of symptoms) is usually four to nine days but can range from two to twenty-one days." *Id.* "Symptoms include fever, headache, joint and muscle aches, diarrhea, and vomiting." *Id.*

The first victim of the 2014 Ebola outbreak may well have been a young boy from a village "deep within the Guinean forest region" who died in December 2013.[6] The disease thereafter spread, "kill[ing] the boy's mother, then his 3-year-old sister, then his grandmother."[7] In the months that followed, dozens more

---

[4] The factual background presented here is primarily derived from allegations in the complaint, which we accept as true in considering a motion to dismiss.

[5] "J.A." refers to the Joint Appendix.

[6] Michelle Roberts, *First Ebola boy likely infected by playing in bat tree*, BBC (Dec. 30, 2014), https://www.bbc.com/news/health-30632453.

[7] Denise Grady and Sheri Fink, *Tracing Ebola's Breakout to an African 2-Year-Old*, N.Y. Times (Aug. 9, 2014), https://www.nytimes.com/2014/08/10/world/africa/tracing-

died as the disease moved between relatives, friends, and health care workers. Soon, the virus had "spread rapidly throughout Guinea, Liberia, and Sierra Leone." J.A. 26. On March 23, 2014, "the World Health Organization ('WHO') announced an outbreak of Ebola in West Africa." *Id.* Over the next twenty-two months, more than 28,000 individuals were diagnosed with Ebola. Over 11,000 died. This was the largest Ebola outbreak in history, yet those afflicted resided almost exclusively in Guinea, Liberia, and Sierra Leone. Outside those three countries, fewer than forty cases of Ebola emerged.

During the outbreak, to prevent the spread of the disease in the United States, both the Centers for Disease Control and Prevention ("CDC") and the Department of Homeland Security ("DHS") released policy guidance on how to manage the flow of people from West Africa. The CDC initially "recommended only self-monitoring or active monitoring for twenty-one days, and recommended no movement restrictions or quarantine" "[f]or asymptomatic individuals returning from West Africa with 'no risk' or 'low risk' of exposure."[8] J.A. 27.

_____

ebolas-breakout-to-an-african-2-year-old.html.

[8] "According to the CDC, 'isolation' is the separation of individuals who are sick with a contagious disease from those who are not sick. 'Quarantine' is the separation of asymptomatic individuals exposed to a contagious disease to see if they become sick." J.A. 28. "'Self-monitoring' refers to a practice whereby people check their own

7

On October 8, 2014, the CDC and the DHS jointly "announced a safety plan" pursuant to which individuals "entering the United States from Guinea, Liberia, and Sierra Leone" were directed "to one of five ports of entry." J.A. 28. On arrival, trained staff screened travelers for signs of illness and inquired about their health and possible prior exposures. If a passenger "required further evaluation or monitoring, federal officers referred those travelers to the appropriate state or local public health authority. Travelers with no symptoms, fever, or a known history of exposure received health information for self-monitoring and were approved to exit the airport." J.A. 28. After the safety plan was announced, the CDC also revised its prior guidance. The new guidance, issued on October 27, "recommended 'no restrictions on travel, work, public conveyances, or congregate gatherings' for asymptomatic individuals . . . who had been in an affected country but had no known exposure." J.A. 30.

Over a year and a half after the virus was first identified, the WHO declared Sierra Leone Ebola-free on November 7, 2015. Guinea and Liberia followed on December 29, 2015, and January 14, 2016, respectively. Despite these

temperature and monitor themselves for symptoms. 'Active monitoring' refers to the 'monitoring of travelers by health departments.'" Appellants Br. 7 n.2.

8

declarations, experts cautioned that these three nations "remain[ed] at high risk of future Ebola outbreaks." *Id.* Nevertheless, on March 29, 2016, the WHO deemed the "Public Health Emergency of International Concern" over. J.A. 111. Since the end of the Ebola crisis in West Africa, there have been at least ten flare-ups or small outbreaks of Ebola in West Africa, and multiple outbreaks in the Democratic Republic of the Congo.

## B. Connecticut's Response

Under Connecticut state law, the state government acquires the authority to quarantine if the Governor declares a public health emergency. Conn. Gen. Stat. § 19a-131a. Once the Governor makes such a declaration, he may authorize the State Public Health Commissioner (the "Commissioner") to quarantine or isolate people "whom the commissioner has reasonable grounds to believe" are or could be infected with a communicable disease. *Id.* § 19a-131b(a). The Commissioner is to issue quarantine and isolation orders only when they are "necessary and the least restrictive alternative to protect or preserve the public health." *Id.* Numerous statutory factors guide the issuance of a quarantine or isolation order. *Id.* § 19a-131b(b). The Commissioner must also comply with various procedural requirements, including informing the quarantined or isolated individuals in

writing, *id.* § 19a-131b(c), limiting the order to a renewable twenty-day period, *id.*, and informing individuals that they have a right to a hearing to challenge their quarantine order and a right to an attorney at this hearing at the State's expense, *id.* § 19a-131b(d).

Turning to the actions of the Governor of Connecticut ("Governor")[9] and then-Commissioner of the Connecticut Department of Public Health Dr. Jewel Mullen (collectively with Acting Commissioner Deidre S. Gifford, "Appellees"), on October 7, 2014, the Governor issued an order declaring a public health emergency for the State of Connecticut. The order authorized Dr. Mullen "to direct the isolation or quarantine of individuals whom she 'reasonably believe[d] to have been exposed to, infected with, or otherwise at risk of passing the Ebola virus.'" J.A. 28.

The following week, on October 16, 2014, "Malloy and Mullen established statewide Ebola response policies . . . that the Governor's office described as 'more stringent than the guidelines thus far issued by the Federal Center[s] for Disease

---

[9] The Governor at the time of the events underlying this suit and when the complaint was filed was Dannel Malloy. He has since been succeeded by Ned Lamont. Accordingly, Governor Lamont has been automatically substituted as a defendant-appellee. *See* Fed. R. App. P. 43(c)(2).

Control and Prevention . . . .' All asymptomatic individuals who had traveled to affected areas or been in contact with an infected individual were to be quarantined at home for twenty-one days." J.A. 28–29. Appellants allege that the Governor and Dr. Mullen knew that their policy went further than was necessary, citing a statement from a Connecticut Department of Public Health spokesman describing people quarantined as "not sick and not a risk to public health." J.A. 29, 71. The policy was ultimately modified and made less restrictive on October 27, the same day the CDC issued the revised guidance discussed above. The new plan "imposed 'mandatory active monitoring' for asymptomatic travelers arriving in Connecticut from Guinea, Liberia, and Sierra Leone, but still contemplated 'quarantine for individuals based on risk factors'" following an "individualized risk assessment." J.A. 29–30.

The revised policy remained in place until April 1, 2016, when, three days after the WHO declared an end to the public health emergency in West Africa, Governor Malloy terminated the emergency in Connecticut.

11

### C. Appellants' Experiences

#### 1. The Ph.D. Candidates

Ryan Boyko and Laura Skrip were Ph.D. candidates at the Yale School of Public Health who traveled to Liberia to help the Liberian Ministry of Health and Social Welfare analyze data collected during the Ebola outbreak. After arriving in Liberia on September 18, 2014, they did not have contact with any Ebola-symptomatic people and took a variety of precautions to avoid exposure. They planned to return to the United States on October 3 but delayed their trip when Boyko developed a cough. Skrip displayed no symptoms, and Boyko felt better after two days. As a condition of returning on a replacement flight, Yale's travel medical insurance company required that Boyko be tested for Ebola. On October 6, he tested negative and received a letter confirming this. When they learned that a freelance cameraman who spent time at their hotel had developed Ebola symptoms, Boyko and Skrip consulted with CDC representatives, who told them that this presented "no risk" because the cameraman did not display symptoms until after they had last seen him. J.A. 33.

Boyko and Skrip left Liberia on October 11 and, upon arriving back in the United States, underwent Ebola screening procedures. DHS officials allowed

12

them to enter the country. Federal officials informed Connecticut officials about Boyko and Skrip's arrival. The pair returned to New Haven, where they took their temperatures twice a day and emailed the results to the Yale Health Center.

On October 15, Boyko developed a fever and was transported to the Yale-New Haven Hospital. Hospital staff took blood samples and sent them to the CDC and the Massachusetts Public Health laboratory for testing. Boyko's fever subsided while he was under the hospital's care and both tests came back negative for Ebola. Contemporaneously, the City of New Haven health department told Skrip that she would be subject to "mandatory active monitoring," meaning that the City would call her twice a day to ask her to take her temperature and report the results. J.A. 34.

On October 17, the same day Boyko received his second negative result, Dr. Mullen ordered him quarantined. The order required him to stay in his home through October 30, twenty-one days after October 10, *i.e.,* the longest possible incubation period for Ebola. The order informed Boyko that failure to comply could lead to penalties but acknowledged that Boyko had a right to a counseled hearing. Dr. Mullen signed an equivalent order for Skrip. Boyko received a copy of his quarantine order in the hospital, but Skrip was informed of hers over

13

the phone. After she informed a Yale official that she had not received an official quarantine order, Skrip received a written order laying out the terms of the quarantine and her rights.

Police officers were deployed outside of Boyko and Skrip's apartments to ensure they complied with the quarantine orders. Their quarantines ended at 12:01 a.m. on October 30, 2014, a day earlier than initially anticipated because of state law requirements. *See* Conn. Gen. Stat. § 19a-131b(c) (only allowing for quarantine orders of twenty days unless the Commissioner of Public Health renews the order). Despite the revision to Connecticut's quarantine policy on October 27, neither Boyko's nor Skrip's quarantine order was reevaluated before the quarantines ended in due course.

### 2. The Mensah-Sieh Family and Assunta Nimley-Phillips

Assunta Nimley-Phillips, who is Louise Mensah-Sieh's sister, immigrated to the United States from Liberia in the 1980s. Mensah-Sieh, her husband Nathaniel Sieh,[10] and their four children—Victor Sieh, Emmanuel Kamara, B.D., and S.N.—lived in Liberia. After receiving visas to live in the United States through the Diversity Visa Lottery, the entire family underwent medical tests on

---

[10] Nathaniel Sieh did not appeal the district court's order of dismissal.

14

the basis of which federal officials approved them for entry into the United States. They arrived on October 18, 2014, at which point the family was screened by DHS personnel and cleared to enter the country. The Mensah-Siehs were neither told to self-monitor nor provided any other quarantine-related information. Nimley-Phillips met her family at the airport and drove them to her home in West Haven, Connecticut. CDC and DHS officials notified Connecticut state and local health officials of the family's arrival.

On October 20, 2014, Maureen Lillis, West Haven Director of Public Health, called Nimley-Phillips and told her that the Mensah-Siehs were subject to a quarantine for twenty-one days. Lillis told Nimley-Phillips to check the family's temperature three times a day and monitor them for symptoms. As with Boyko and Skrip, police officers were stationed outside Nimley-Phillips's home and barred anyone from entering or exiting the house apart from Nimley-Phillips and her adult daughter. Neither Nimley-Phillips nor the Mensah-Sieh family received a written quarantine order, official communications about the quarantine, or information regarding their right to challenge the quarantine. No adjustments were made to the Mensah-Siehs' quarantine orders following the October 27 revision to Connecticut's quarantine policy.

### 3. The Yalartais and the Liberian Community Association of Connecticut

The other Appellants—Bishop Harmon Yalartai, Esther Yalartai, and the Liberian Community Association of Connecticut ("LCAC")—all allege that they intend to travel to Liberia and fear being subject to quarantine orders upon their return. Indeed, three of the Appellants—the Yalartais and Skrip—were in Liberia when the complaint was filed. The Yalartais, who were born in Liberia but reside in Connecticut, are leaders of a religious organization with churches in both Liberia and Connecticut. They regularly travel to and from Liberia to oversee the work of their church. LCAC is a non-profit organization that works to enhance the lot of the Liberian community in Connecticut and contribute to development efforts in Liberia. Dozens of its 230 members regularly travel to Liberia.

## II. Procedural History

Appellants filed their putative class action suit on February 8, 2016. All Appellants sought declaratory and injunctive relief; Boyko and the Mensah-Siehs also sought damages from Dr. Mullen. Appellants allege that Appellees, *inter alia*, (1) violated the substantive due process rights of Boyko, Skrip and the Mensah-Siehs by "quarantining them without medical or epidemiological justification and in a manner that substantially exceeded the least restrictive means

16

necessary"; (2) violated their procedural due process rights by failing to make individualized assessments or providing adequate notice and an opportunity to challenge their quarantines; and (3) violated the Fourth Amendment by unreasonably seizing them through the quarantines.[11]  J.A. 58–62.  They also asserted various state law tort claims, and moved to certify a "class consisting of all persons who will or intend to travel from Ebola-affected countries to Connecticut and are at risk of Defendants subjecting them to an unlawful and scientifically unjustified quarantine."  J.A. 54.  Appellees filed a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Rule 12(b)(6), and they opposed the motion for class certification.

The district court denied the motion for class certification, "concluding that the proposed class is too speculative to satisfy the numerosity requirement for class certification."  *Liberian Cmty. Ass'n v. Malloy*, No. 3:16-cv-201, 2016 WL 10314574, at *7 (D. Conn. Aug. 1, 2016).  In a separate decision, the district court granted Appellees' motion to dismiss.  *Liberian Cmty. Ass'n v. Malloy*, No. 3:16-cv-

---

[11] Before the district court, Appellants also asserted claims under the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794, which they do not press on appeal and we need not address.

201, 2017 WL 4897048, at *1 (D. Conn. Mar. 30, 2017). As to the claims for declaratory and injunctive relief, the district court found that Appellants lacked standing because they failed to establish "a 'real and immediate' threat of injury." *Id.* at *7–8 (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). The district court further concluded that Dr. Mullen was entitled to qualified immunity on the damages claim. *Id.* at *9–14. Finally, as to the state law claims, the district court "decline[d] to exercise supplemental jurisdiction over the plaintiffs' state law causes of action," *id.* at *15, necessarily dismissing them without prejudice. *See Carter v. HealthPort Techs., LLC*, 82 F.3d 47, 54–55 (2d Cir. 2016); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." (footnote omitted)). Accordingly, the district court entered judgment dismissing the action, although the judgment did not specify that the state claims were dismissed without prejudice.[12] This appeal followed.

---

[12] In light of our decision to affirm the dismissal of the federal claims, we do not address the merits of the state law claims. However, we remand as to these claims, with instructions to the district court that it amend the judgment to make clear that these claims are dismissed without prejudice.

18

**DISCUSSION**

Appellants advance two principal arguments on appeal: *first*, that they have standing to seek prospective relief, and, *second*, that Dr. Mullen is not entitled to qualified immunity on Boyko and the Mensah-Siehs' damages claim. We disagree as to both arguments and discern no error in the district court's standing or qualified immunity analysis.

**I**

"Standing to sue is a doctrine" that "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). As relevant here, the "injury in fact" must have been "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks and citations omitted).

"Allegations of possible future injury do not satisfy the requirements of Art[icle] III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Rather, there must be "a 'substantial risk' that harm will occur." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–54 (2010)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

"[T]he proper procedural route [for bringing a standing challenge] is a motion under Rule 12(b)(1)." *All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006). And on appeal from a dismissal under Rule 12(b)(1), as here, "we review the court's factual findings for clear error and its legal conclusions *de novo*." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015). "The plaintiff[s] bear[] the burden of 'alleg[ing] facts that affirmatively and plausibly suggest that [they] ha[ve] standing to sue.'" *Id.* (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)). All allegations made in the complaint are accepted as true and construed in favor of the plaintiffs. *Id.* (citing *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008)).

Appellants failed to plead a sufficient likelihood that, under the revised policy, any of them faces a substantial risk of suffering a future injury. *See City of*

*Los Angeles v. Lyons*, 461 U.S. 95, 106–07 (1983). Indeed, the revised policy—that is, the policy that was in effect when the complaint was filed—defaults to active monitoring for any arriving asymptomatic travelers and permits quarantine only after an individualized assessment. In *Lyons*, the Supreme Court directed the dismissal of Lyons' complaint challenging the use of chokeholds by Los Angeles police because the complaint "did not indicate why Lyons might be realistically threatened by police officers who acted within the strictures of the City's policy." *Id.* at 106. Here, as in *Lyons*, Appellants have failed plausibly to allege any basis for concluding that they will be threatened with quarantine by Connecticut state officials who act within the revised policy.

Appellants argue that Appellees' failure to reassess the quarantines imposed on Boyko, Skrip, and the Mensah-Siehs in light of the revised policy demonstrates its "irrational execution," supposedly enhancing their risk of future injury. Appellants Br. 54. But the fact that Appellees declined to reconsider a previously imposed quarantine offers scant if any basis for assessing the substantiality of the *prospective* risk. Particularly in light of the individualized assessment mandated by the revised policy, Appellants "can only speculate as to whether [Appellees] will authorize such [quarantines]" in the future. *Clapper*,

21

568 U.S. at 413. And under the circumstances alleged in this complaint, "[w]e decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Id.* at 414.

In a final effort to overcome the deficiencies in the complaint, Appellants assert that they also suffer a "present harm" because the quarantine policy "that was firmly in place at the time of filing and had already been applied against several of them" "restricted [their] freedom by greatly increasing the potential monetary, time, and personal costs of traveling to Liberia." Appellants Br. 56–57 (emphasis omitted). But this argument of present harm is contrary to the complaint's own allegations. As already noted (and as the complaint alleges), the policy that was applied to quarantine Boyko, Skrip and the Mensah-Siehs was revised shortly after their quarantines were imposed. Appellants do not allege that they—or anyone else—have been subjected to a quarantine *since* the revised policy issued. Such circumstances thus distinguish Appellants from the plaintiffs in *Monsanto*, 561 U.S. at 153–55, and *Friends of the Earth*, 528 U.S. at 184–85, upon which they rely. The plaintiffs in those cases averred that they would have to take immediate and concrete steps to avoid harm. *See Monsanto*, 561 U.S. at 154 ("[R]espondents would have to conduct testing to find out whether and to

22

what extent their crops have been contaminated."); *Friends of the Earth*, 528 U.S. at 184 ("[A] company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms."). Conversely here, Appellants merely allege that they must make travel plans "under the reasonable fear of being subject to another unjustified and unlawful quarantine." [13] J.A. 49. In sum, the notion that Appellants must undertake reasonable efforts in the present to avert injury in the future is also speculative, and Appellants lack standing to pursue any of their prospective claims. [14]

---

[13] Indeed, Skrip and the Yalartais—the only Appellants who specifically allege that they intend to visit Liberia in the future—allege no changes to their travel plans at all, let alone that they either have incurred or will incur concrete costs because of their fear of the challenged policy.

[14] Because we conclude that none of the named plaintiffs has standing to pursue their claims for prospective relief, the class proposed by Appellants necessarily fails as well. *See Amador v. Andrews*, 655 F.3d 89, 99 (2d Cir. 2011) ("[A] class action cannot be sustained without a named plaintiff who has standing."); *see also NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012) ("[W]e have said that, to establish Article III standing in a class action[,] for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis." (brackets, ellipsis, and quotation marks omitted)). Accordingly, we do not reach the class certification question.

## II

We now turn to the claim for damages against Dr. Mullen. "To survive a 12(b)(6) motion to dismiss, a 'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Drimal v. Tai*, 786 F.3d 219, 223 (2d Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Here, Appellees asserted a qualified immunity defense in their Rule 12(b)(6) motion to dismiss. We review a district court's determination as to qualified immunity on a motion to dismiss *de novo*, "'accepting as true the material facts alleged in the complaint and drawing all reasonable inferences in plaintiffs' favor.'" *Garcia v. Does*, 779 F.3d 84, 91 (2d Cir. 2015) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001)). The Supreme Court has "repeatedly 'stressed the importance of resolving immunity questions at the earliest possible stage [of the] litigation,'" *Wood v. Moss*, 572 U.S. 744, 755 n.4 (2014) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)), and it is "well established that an affirmative defense of official immunity . . . may be resolved by Rule 12(b)(6) if clearly established by the

allegations within the complaint," *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998); *see also McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (noting that qualified immunity defense may be "successfully asserted in a Rule 12(b)(6) motion").

At the start, qualified immunity doctrine "is intended to provide government officials with the ability to 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). When the "general rule of qualified immunity" is applicable, "officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law." *Id.* Public officials are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). And a court need not determine whether a defendant violated a plaintiff's rights if it decides that the right was not clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

To be sure, "a case directly on point" is not required "for a right to be clearly established." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam). At the same time, "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Id.* (emphasis added). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every 'reasonable official would understand that what he is doing' is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In practice, this means that "'controlling authority' or 'a robust consensus of cases of persuasive authority'" dictate the action at issue. *Id.* at 589–90 (quoting *al-Kidd*, 563 U.S. at 741–42). A plaintiff must show with a high "degree of specificity," *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam), that the rule he seeks to apply prohibited the officer's conduct. *See Wesby*, 138 S. Ct. at 590; *see also City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015) (noting that the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality"). In other words, an official is immune from liability unless, under the particular circumstances the official faced, any "reasonable offic[ial]" would have "known for certain that the conduct was

26

unlawful" under then-existing precedent. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

Boyko and the Mensah-Siehs—the only Appellants seeking damages—advance three legal bases for their claim: substantive due process, procedural due process, and the Fourth Amendment's prohibition on unreasonable seizures. We discuss only whether, at the time of Dr. Mullen's alleged conduct, it was clearly established that her conduct ran afoul of these constitutional protections.[15]

### A. Substantive Due Process

Appellants first argue that "[b]ecause quarantines—a form of civil detention—implicate fundamental liberty interests, existing law clearly establishes that officials may impose them only when necessary to achieve a

---

[15] Appellants urge us to "address the merits of the constitutional issue even if the Court were to conclude that Dr. Mullen's conduct is shielded by qualified immunity." Appellants Br. 48. Yet the Supreme Court has cautioned us to "think hard, and then think hard again, before turning small cases into large ones." *Camreta v. Greene*, 563 U.S. 692, 707 (2011); *see also al-Kidd*, 563 U.S. at 735 ("Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" (quoting *Pearson*, 555 U.S. at 236–37)). While there are circumstances in which discretion is properly exercised to address step one of the qualified immunity analysis even when qualified immunity is appropriate at step two, this is not such a situation. *See, e.g., Jones v. Chandrasuwan*, 820 F.3d 685, 691–92 (4th Cir. 2016); *Morgan v. Swanson*, 659 F.3d 359, 385 (5th Cir. 2011); *cf. Pearson*, 555 U.S. at 237–39 (cataloguing situations where reaching the constitutional question is inappropriate).

compelling state interest and in the absence of less restrictive means." Appellants Br. 30 (citing *Lawrence v. Texas*, 539 U.S. 558, 593 (2003); *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).   According to Appellants, "[c]ases in multiple civil commitment settings confirm that substantive due process analysis applies whenever, as with quarantine, a state civilly confines an individual ostensibly to protect the public."   Appellants Br. 31 (citing cases).   And Appellants cite Second Circuit precedent to the effect that "involuntary confinement of an individual *for any reason*"—which, according to Appellants, includes the quarantining of individuals amidst an infectious disease outbreak—is subject to a least-restrictive-means test.   Appellants Br. 33 (quoting *Project Release v. Prevost*, 722 F.2d 960, 971 (2d Cir. 1983)) (emphasis in Appellants Br.).

But Appellants take this Court's language out of context.   The full quotation from *Project Release* makes clear that its "for any reason" language refers specifically to various public policy justifications a state might have to commit the mentally ill, such as its "*parens patriae*" or "police power" authority.   *See Project Release*, 722 F.2d at 971.   Read in context, it is clear that the Court, in articulating a least-restrictive-means test, was referring *only* to the civil detention of people who are mentally ill.   Indeed, every case relied upon by *Project Release* in

28

discussing due process solely addresses confinement of the mentally ill—not, as

Appellants contend, multiple settings.   *See, e.g.*, *Vitek v. Jones*, 445 U.S. 480 (1980);

*Addington v. Texas*, 441 U.S. 418 (1979); *O'Connor v. Donaldson*, 422 U.S. 563 (1975);

*Humphrey v. Cady*, 405 U.S. 504 (1972); *see also Foucha v. Louisiana*, 504 U.S. 71, 80

(1992); *Jones v. United States*, 463 U.S. 354 (1983); *Francis S. v. Stone*, 221 F.3d 100,

111 (2d Cir. 2000).   A "reasonable official" would thus not necessarily interpret

*Project Release* or any of these other cases to define the outer limits of the state's

quarantine power in the context of a major Ebola outbreak.[16]   *Wesby*, 138 S. Ct. at

590.

The dissent similarly finds support for a least-restrictive-means test in the

context of an Ebola-related quarantine in the Supreme Court's affirmation in *Jones*

*v. United States* that "'commitment *for any purpose* constitutes a significant

deprivation of liberty that requires due process protection.'"   Dissenting Op. 3–4

(quoting *Jones*, 463 U.S. at 361) (emphasis in dissent).   Again, however, the due

---

[16] *Jolly v. Coughlin*, 76 F.3d 468, 479–80 (2d Cir. 1996), upon which Judge Chin's partial dissent ("dissent") relies, is similarly unhelpful in establishing the substantive due process standard urged by Appellants.   Indeed, *Jolly* does not even address a due process claim.   The "medical keeplock" at issue there was challenged under the Religious Freedom Restoration Act, which by its terms applies a least-restrictive-means test only to claims regarding the exercise of religion.   *See id.* at 474.

process standards articulated in *Jones*, as in *Project Release*, concern civil commitment of the mentally ill. Taking a generalized statement like that found in *Project Release* or *Jones* as evidence of a "clearly established rule" in the context of quarantines conflicts with the Supreme Court's directive that we should not "define clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. at 308; *see id.* ("This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). Quarantines against infectious disease, involving different public safety concerns and implicating different liberty interests, are simply not sufficiently analogous to civil commitment of the mentally ill to clearly establish applicable due process constraints. As the Supreme Court explained in *City of Sacramento v. Lewis*, "[r]ules of due process are not . . . subject to mechanical application in unfamiliar territory." 523 U.S. 833, 850 (1998); *cf. Reno v. Flores*, 507 U.S. 292, 302 (1993) ("'Substantive due process' analysis must begin with a careful description of the asserted right, for 'the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'" (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)) (brackets omitted)). Accordingly, not "every reasonable official would interpret [civil

commitment cases] to establish the particular rule that the plaintiff[s] seek[] to apply." *Wesby*, 138 S. Ct. at 590.

Indeed, Appellants point to only one decision that has applied the civil commitment line of cases in the infectious disease context: *Best v. St. Vincents Hosp.*, No. 03 CV.0365, 2003 WL 21518829 (S.D.N.Y. July 2, 2003), *adopted by* 2003 WL 21767656, *aff'd in relevant part sub nom. Best v. Bellevue Hosp.*, 115 F. App'x 459 (2d Cir. 2004). But a single magistrate's report and recommendation, even when adopted by a district court, is insufficient, standing alone, to clearly establish a constitutional rule.[17] *Cf. Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 61 (2d Cir. 2014) ("[W]e have specifically cautioned against the reliance on non-precedential summary orders [and district court opinions] in 'clearly established' analyses" because "'[n]on-precedential' decisions, by their very definition, do not make law." (citing *Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011))).

Nor does it help to situate *Best* among other decisions addressing quarantines and infectious diseases. By the late nineteenth century, "the right of the legislature to enact such measures as will protect all persons from the

---

[17] We did not have occasion to pass on the merits of the magistrate judge's analysis in summarily affirming in part the judgment on appeal.

impending calamity of a pestilence" was well established. *In re Smith*, 146 N.Y. 68, 77 (1895). As the doctrine developed into the early twentieth century, courts gradually recognized limits on this power. Even so, neither Appellants nor the dissent point to any authority in this archipelago of cases that clearly establishes the substantive due process rule they now urge.[18]

Quite to the contrary. In assessing the constitutionality of a Massachusetts law requiring individuals to either receive the smallpox vaccine or pay a fine, the Supreme Court noted in 1905 that "the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative

---

[18] For instance, in *Chy Lung v. Freeman*, the Supreme Court considered a California statute which allowed the State to exclude arriving passengers on a number of grounds, including if they were "a public charge, or likely soon to become so" because of "sickness or disease." 92 U.S. 275, 277 (1875). But far from articulating substantive due process limits on the quarantine authority, the Court ultimately struck down the statute because it conflicted with the federal government's authority to regulate immigration. *Id.* at 281. In *Smith*, the New York Court of Appeals ruled unlawful the quarantine of individuals who had been detained for refusing to receive a smallpox vaccine. 146 N.Y. at 78. But it in no way articulated a least-restrictive-means test of the sort urged by Appellants, instead recognizing "some latitude of a reasonable discretion . . . to the local authorities upon the facts of a case." *Id.* A pair of cases from California struck down discriminatorily enforced quarantines. *See Jew Ho v. Williamson*, 103 F. 10, 26 (N.D. Cal. 1900) ("The evidence here is clear that this [quarantine] is made to operate against the Chinese population only . . . ."); *Wong Wai v. Williamson*, 103 F. 1, 7 (N.D. Cal. 1900) (granting injunction prohibiting government officials from enforcing a quarantine targeting Chinese individuals). But neither of these cases is analogous to the instant suit as both involved neighborhood-wide discriminatory quarantines. No similar allegations are made here.

enactment as will protect the public health and the public safety." *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905); *Compagnie Francaise de Navigation a Vapeur v. State Bd. of Health*, 186 U.S. 380, 387 (1902) ("[T]he power of the states to enact and enforce quarantine laws for the safety and the protection of the health of their inhabitants . . . is beyond question."). The Court recognized that such measures could be unlawful if undertaken in "an arbitrary, unreasonable manner, or . . . go[ing] so far beyond what was reasonably required for the safety of the public . . . ." *Jacobson*, 197 U.S. at 28; *see also id.* at 31 (noting that courts may strike down public health statutes if they have "no real or substantial relation to those objects, or [are], beyond all question, a plain, palpable invasion of rights"). But of particular relevance here is the Supreme Court's acknowledgement that:

> An American citizen arriving at an American port on a vessel in which, during the voyage, there had been cases of yellow fever or Asiatic cholera, . . . although apparently free from disease himself, may yet, in some circumstances, be held in quarantine against his will on board of such vessel or in a quarantine station, until it be ascertained by inspection, conducted with due diligence, that the danger of the spread of the disease among the community at large has disappeared.

*Id.* at 29; *see also United States v. Harris*, 838 F.3d 98, 107 (2d Cir. 2016) ("[E]ven if the statement is fairly characterized as dictum, we are obligated 'to accord great

33

deference to Supreme Court dicta, absent a change in the legal landscape.'"

(quoting *Newdow v. Peterson*, 753 F.3d 105, 108 n.3 (2d Cir. 2014))).

Since *Jacobson*, the Supreme Court has not addressed the limits imposed by due process on a State's power to manage infectious diseases. Moreover, in a small number of decisions, other courts have adopted approaches more deferential than the least-restrictive-means test urged by Appellants. *See, e.g., United States ex rel. Siegel v. Shinnick*, 219 F. Supp. 789, 790–91 (E.D.N.Y. 1963) (upholding the decision to isolate a woman who arrived in the United States from a region infected with smallpox for the entire incubation period of the disease as "reached in obvious good faith" after "forthright, reasoned and circumstantially reassuring" consideration); *People ex rel. Baker v. Strautz*, 386 Ill. 360, 362, 364–65 (1944) (upholding statute authorizing isolation of criminal defendants who "may be suffering from any communicable venereal disease" on the grounds that "the courts will not interfere with the exercise of this power except where the regulations adopted for the protection of the public health are arbitrary, oppressive and unreasonable").

Appellants and the dissent contend that the trend nevertheless goes in the other direction and that courts have grown less deferential in modern times. *See,*

*e.g.*, *City of Newark v. J.S.*, 652 A.2d 265 (N.J. Super. Ct., Essex Cty. 1993) (discussing the least-restrictive-means test). But the cases do not bear out this purported trend. In *Hickox v. Christie*, for example, which arose out of the same Ebola crisis that gave rise to this appeal, the court concluded that "[t]he case law regarding the least restrictive means requirement falls far short of a clear consensus capable of defeating qualified immunity." 205 F. Supp. 3d 579, 599 (D.N.J. 2016). That court's review of the quarantine case law led it to suggest that the usual standard applied is one of "arbitrariness or unreasonableness." *Id.* at 593; *see also Daniels v. Maricopa Cty. Special Health Care Dist.*, No. CV-07-1080, 2009 WL 10708630, at *7 (D. Ariz. Oct. 20, 2009) (rejecting due process challenge to isolation of tuberculosis patient under a "reasonably related" standard).

Nor do the smattering of state trial court decisions relied upon by the dissent change the analysis. Passing over the fact that such precedent cannot clearly establish law, *see Matusick*, 757 F.3d at 61, none of these decisions even purported to apply federal due process standards. Both *In re City of New York v. Antoinette R.*, 165 Misc.2d 1014 (N.Y. Sup. Ct., Queens Cty. 1995), and *Mayhew v. Hickox*, No. CV-2014-26 (Me. Dist. Ct., Oct. 31, 2014), assessed quarantine orders against the backdrop of state or municipal laws that incorporated a least-restrictive-means

test.   Appellants and the dissent both emphasize that Connecticut's quarantine law employs a least-restrictive-means test.   *See* Conn. Gen. Stat. § 19a-131b(a). But the fact that Connecticut and other states have seen fit to adopt this test by statute is not relevant to our qualified immunity analysis.   "[W]e have repeatedly held[] that a state statute does not serve as 'clearly established law' for purposes of qualified immunity."   *Tooly v. Schwaller*, 919 F.3d 165, 172 (2d Cir. 2019).   Put another way, assuming *arguendo* that Appellees' actions violated Connecticut law, "the court must [still] determine whether the conduct that violated the state statute also violates clearly established federal law, and this is a distinct and separate inquiry."   *Id.* at 173.

In sum, there was by no means a "robust consensus" on the proper standard for analyzing quarantine claims at the time of the conduct at issue here.   *Wesby*, 138 S. Ct. 591.   To the extent the substantive due process restrictions articulated by Appellants existed then, they were "at best undeveloped."   *Wilson v. Layne*, 526 U.S. 603, 617 (1999).   That district courts in this Circuit (*Best* and *Shinnick*, specifically) have employed different analyses only further "demonstrates that the law on the point [was] not well established."   *Ziglar*, 137 S. Ct. at 1868.

36

In such circumstances, where the precedent is simply not "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply," *Wesby*, 138 S. Ct. at 589–90, the qualified immunity bar applies. As the Supreme Court has recognized, public officials cannot be expected "to predict the future course of constitutional law" based on their reading of a handful of non-precedential opinions. *Wilson*, 526 U.S. at 617–18 (quoting *Procunier v. Navarette*, 434 U.S. 555, 562 (1978)). It is "unfair" to subject such officials to damages liability when even "judges . . . disagree." *Id.* at 618. Neither civil commitment law nor other infectious disease cases had clearly articulated the substantive due process standard Appellants urge should have governed Dr. Mullen's actions. Accordingly, the district court did not err in affording qualified immunity as to this claim.

## B. Procedural Due Process

Appellants next argue that Dr. Mullen violated procedural due process by failing: (1) to conduct an individualized assessment of Appellants' risk to public health; (2) to provide timely notice of the process for judicial review; and (3) to initiate a judicial hearing whereby Appellants could challenge their detention. Again, however, Appellants are unable to point to clearly established law that

supports the conclusion that every reasonable official would have understood that these measures were required at the time the challenged events occurred.

The inquiry into the existence of a procedural due process right is guided by the three-factor balancing test enunciated in *Mathews v. Eldridge*, 424 U.S. 319 (1976). At the start, because that analysis entails balancing multiple factors, procedural due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 895, (1961)). Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "Given this flexible, context-dependent approach, it will be a rare case in which prior precedents have definitively resolved a novel claim of procedural due process. That makes particularly fertile ground for qualified immunity, given that state officials can be liable only for violations of rights that have been established 'beyond debate' and with 'particular[ity]' by existing constitutional precedents." *Francis v. Fiacco*, 942 F.3d 126, 149 (2d Cir. 2019) (quoting *White*, 137 S. Ct. at 551–52).

Again, Appellants and the dissent rely almost exclusively upon cases imported from the civil commitment context or upon Connecticut state law. But as already explained, the civil commitment cases are insufficiently analogous to clearly establish the procedural rights Appellants urge us to adopt in this case. *See Levin v. Adalberto M.*, 156 Cal. App. 4th 288, 298–02 (2007) (referring, in dicta, to civil commitment context as "analogous" to the civil detention of a tuberculosis patient but noting that infectious diseases like tuberculosis "differ[] from mental illness in ways that justify fewer procedural safeguards, not more"). And "[a] violation of state law neither gives plaintiffs a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim." *Doe v. Conn. Dep't of Child & Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990).

Indeed, we have been unable to find—and Appellants do not identify—any cases articulating *federal* procedural due process protections in the quarantine context. The most analogous case, *Greene v. Edwards*, 164 W. Va. 326, 327–29 (1980) (per curiam), held that due process guarantees certain procedural rights— including adequate notice, a right to counsel, and an elevated burden of proof— when the state seeks to involuntarily confine an individual with tuberculosis. *See also Kirk v. Wyman*, 83 S.C. 372, 390 (1909) ("[B]oards of health may not deprive any

39

person of his property or his liberty, unless the deprivation is made to appear, by due inquiry, to be reasonably necessary to the public health; and such inquiry must include notice to the person whose property or liberty is involved, and the opportunity to him to be heard, unless the emergency appears to be so great that such notice and hearing could be had only at the peril of the public safety."). But the Supreme Court of Appeals of West Virginia relied primarily on state law to reach this conclusion. *See Greene*, 164 W. Va. at 327–29. And cases from both the Supreme Court and our Court make clear that the federal procedural due process guarantee does *not* require state officials to inform individuals of all the procedural guarantees they enjoy under state law. *See City of W. Covina v. Perkin*s, 525 U.S. 234, 240-41 (1999) (holding that a city that seizes an owner's property must inform the owner that "his property has been seized" but "need not take other steps to inform him of his [legal] options" because he "can turn to . . . public sources to learn about the remedial procedures available to him"); *United States v. Lopez*, 445 F.3d 90, 95 (2d Cir. 2006) (Sotomayor, *J.*) (holding that failure to inform an alien in deportation proceedings of his right to seek habeas review did not deny him meaningful judicial review because "where judicial remedies are readily available

in case law and statutes, due process is not offended where no notice of those remedies is provided").

The rationale of *Perkins* and *Lopez* has at least arguable purchase here, where Boyko, Skrip, and the Mensah-Siehs all did receive notice that they were subject to a mandatory quarantine, and where post-quarantine hearings were available to them under Connecticut law, *see* Conn. Gen. Stat. § 19a-131b. While the full panoply of their rights under state law was not immediately conveyed to them in writing, nor was a hearing convened, Appellants point to no case that clearly establishes that Dr. Mullen violated the Constitution by failing to undertake these measures.

### C. The Fourth Amendment

Finally, Appellants assert that "Dr. Mullen's over-inclusive sweep was not reasonable under the Fourth Amendment," Appellants Br. 48, because in quarantining Boyko, Skrip, and the Mensah-Siehs, she "depart[ed] from what is scientifically justified for a particular disease," Appellants Reply Br. 9 (quotation marks omitted). According to Appellants, "all Plaintiffs had no known exposure to Ebola," Appellants Br. 39, Boyko had undergone several blood tests confirming that he did not have the disease, and Boyko and Skrip had been assured by CDC

41

representatives that any interactions with a person in their hotel who later developed symptoms posed no risk. This claim is essentially the same as their substantive due process claim but is recast in Fourth Amendment terms.

Qualified immunity affords especial protection to state officials in the Fourth Amendment context. *See Wesby*, 138 S. Ct. at 590 (holding that the "specificity" requirement is "especially important in the Fourth Amendment context") (quoting *Mullenix*, 136 S. Ct. at 308). The Supreme Court has observed, for instance, that "[p]robable cause 'turn[s] on the assessment of probabilities in particular factual contexts' and cannot be 'reduced to a neat set of legal rules.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Therefore, a plaintiff must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id.* (quoting *Pauly*, 137 S. Ct. at 522).

Appellants have cited no case in which a court has invalidated a quarantine order under the Fourth Amendment. And although they characterize their quarantines as "scientifically unjustified," Appellants Br. 58, a number of factors could support a determination that the quarantines were at least arguably reasonable as a matter of Fourth Amendment law. *Cf. Camara v. Mun. Ct. of City & Cty. of S.F.*, 387 U.S. 523, 538 (1967) ("Where considerations of health and safety

42

are involved, the facts that would justify an inference of 'probable cause' to make an inspection are clearly different from those that would justify such an inference where a criminal investigation has been undertaken." (quoting *Frank v. Maryland*, 359 U.S. 360, 383 (1959) (Douglas, *J.*, dissenting)). Put simply, it was not clearly established that it was *unreasonable*, pursuant to the Fourth Amendment, for Appellees to quarantine individuals traveling from a nation suffering from an Ebola epidemic for the duration of the disease's incubation period. And in such circumstances, Dr. Mullen is entitled to qualified immunity.

To be clear, we need not and do not reach the merits of Appellants' constitutional claims. We conclude simply that the district court did not err in determining that no clearly established law existed at the time of Dr. Mullen's actions such that every reasonable official would have known that her conduct fell outside the boundaries of due process and Fourth Amendment constraints. No significant precedent had previously articulated the requirements of substantive due process, procedural due process, or the Fourth Amendment in the quarantine or infectious diseases contexts, as urged by Appellants here. In such circumstances, the district court properly concluded that Dr. Mullen is entitled to qualified immunity.

43

**CONCLUSION**

We have considered Appellants' remaining arguments and find them to be without merit. For the foregoing reasons, we AFFIRM the judgment of the district court but REMAND with instructions to amend the judgment to clarify that the state law claims were dismissed without prejudice.

CHIN, *Circuit Judge*, concurring in part and dissenting in part:

I concur in the majority's decision to affirm the dismissal of the claims for prospective or injunctive relief for lack of standing and the denial of class certification, but I dissent as to its holding that the claims for damages are barred by qualified immunity.

As we have seen most strikingly with the current epidemic, the government surely has a compelling interest in preventing the spread of disease. At the same time, however, the government's power to protect the community may not be exercised in an unreasonable or arbitrary manner. While intrusions on personal liberties will of course be necessary to safeguard public health and safety, they must be based on scientific and not political considerations. In my view, plaintiffs-appellants Ryan Boyko and Laura Skrip and Louise Mensah-Sieh, Nathaniel Sieh, and their children (collectively, "plaintiffs") plausibly alleged that defendant-appellee Dr. Jewel Mullen, then-Commissioner of Public Health, violated their constitutional rights by ordering them, in connection with the Ebola outbreak in 2014, into quarantine for two weeks in the case of Boyko and Skrip and three weeks in the case of the Mensah-Sieh family, when quarantine was not scientifically or medically warranted or justified. Moreover, in my view,

plaintiffs plausibly alleged violations of clearly established rights such that, at the pleadings stage of the case, it was error for the district court to dismiss these claims based on qualified immunity. Accordingly, I would reverse as to plaintiffs' claims for damages.

## I.

## A.

More than a century ago, the Supreme Court recognized the need to balance the government's interest in protecting the public health and safety by controlling the spread of disease against the rights of individuals to be free from unreasonable restraint. In *Jacobson v. Massachusetts*, in upholding the authority of states to require vaccinations in response to an outbreak of smallpox, the Supreme Court acknowledged that a state's power to fight the spread of disease is not without limit:

> [I]t might be that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons.

197 U.S. 11, 28 (1905). The Court also emphasized that:

2

> if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* at 31. This reasoning, of course, applies not just to statutes but to any governmental restriction on individual rights taken ostensibly to protect public health and safety.

It has long been established that the Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from infringing on "'fundamental' liberty interests . . . unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301-02 (1993). Indeed, "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker*, 364 U.S. 479, 488 (1960).

"Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause," *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992), and "[i]t is clear that 'commitment *for any purpose* constitutes a significant deprivation of liberty that requires due process protection,'" *Jones v. United States*,

3

463 U.S. 354, 361 (1983) (emphasis added) (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)); *accord Project Release v. Prevost*, 722 F.2d 960, 971 (2d Cir. 1983) ("Civil commitment for *any purpose* requires due process protection.") (emphasis added).  Hence, a government-imposed quarantine implicates the Constitution, as mandatory quarantine is a form of civil detention -- an involuntary confinement and a deprivation of liberty.

Courts have applied these due process concepts to quarantine or similar isolation orders and considered whether the restrictions were reasonable in relation to the goal of protecting the health of others.  In *Jolly v. Coughlin*, for example, this Court upheld a preliminary injunction barring prison officials from keeping an inmate in "medical keeplock" after he refused, for religious reasons, to take a tuberculosis test, where he did not have active tuberculosis and could be monitored for tuberculosis by other means.  76 F.3d 468, 479-80 (2d Cir. 1996).  In two cases involving the detention of individuals with tuberculosis who were either unwilling or unable to comply with medical directives, the courts applied due process principles.  While the courts ultimately determined that isolation was the best option in both cases, they considered whether less restrictive means were available.  *See City of Newark v. J.S.*, 279 N.J. Super. Ct. Law Div. 178, 184-85

4

(1993); *Matter of City of New York v. Antoinette R.*, 630 N.Y.S.2d 1008, 1019 (N.Y. Sup. Ct. 1995). In an Ebola case in Maine, the court concluded that isolation was not required to protect others from the danger of infection, determining that a less restrictive monitoring order was sufficient. *See Mayhew v. Hickox*, No. CV-2014-36 (Dist. Ct., Fort Kent, ME Oct. 31, 2014); *cf. Hickox v. Christie*, 205 F. Supp. 3d 579, 593-94 (D.N.J. 2016) (dismissing federal claims brought by nurse who was subjected to mandatory quarantine, based on qualified immunity doctrine). And years ago, in *Jew Ho v. Williamson*, the court found that an ordinance sealing off an area of San Francisco in such a way as "to operate against the Chinese population only," purportedly to prevent the spread of the bubonic plague, 103 F. 10, 23 (Cir. Ct. N.D. Ca. 1900), was "unreasonable, unjust, and oppressive," *id.* at 26.[1]

In Connecticut, due process protections are expressly written into the statute governing quarantine. The Connecticut statute provides (and provided in 2014) that "[t]he commissioner . . . may order into quarantine or

---

[11]     *See also Wong Wai v. Williamson*, 103 F. 1, 3, 7 (Cir. Ct. N.D. Ca. 1900) (striking down regulation requiring inoculation of "all the Chinese residents" of the city and county of San Francisco against the bubonic plague and restricting their ability to travel, as discriminatory and not supported by any evidence that "the Asiatic or Mongolian race . . . [was] more liable to the plague than any other").

5

isolation, as appropriate, any individual . . . or individuals . . . if the

commissioner determines that such individual or individuals pose a significant

threat to the public health and that quarantine or isolation is *necessary* and *the

least restrictive alternative* to protect or preserve the public health." Conn. Gen.

Stat. Ann. § 19a-131b(a) (emphasis added).

Even "[w]hen government action depriving a person of life, liberty,

or property survives substantive due process scrutiny," procedural due process

requires that the action "still be implemented in a fair manner." *United States v.

Salerno*, 481 U.S. 739, 746 (1987). This generally requires consideration of three

distinct factors:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through
> the procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural
> requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).

Procedural due process applies to involuntary confinement. *See,

e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). This is because "[p]rocedural due

process imposes constraints on governmental decisions which deprive

6

individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Eldridge*, 424 U.S. at 332. Although "the Court usually has held that the Constitution requires some kind of hearing *before* the State deprives a person of liberty," *Zinermon v. Burch*, 494 U.S. 113, 127 (1990), "post-deprivation hearings are appropriate and constitutionally permissible in emergency situations," *Bailey v. Pataki*, 708 F.3d 391, 406 (2d Cir. 2013). Notably, Connecticut law also guarantees a written quarantine order that informs the recipient of the right to a hearing and how to request it; an individuated assessment of risk; and an opportunity to seek post-deprivation judicial review. Conn. Gen. Stat. § 19a-131b(c), (d), (f).

**B.**

In my view, plaintiffs plausibly alleged both substantive and procedural due process violations.

First, the complaint alleges that Boyko and Skrip as well as the Mensah-Sieh family were involuntarily confined and deprived of their fundamental right to liberty, for two weeks as to Boyko and Skrip and three weeks as to the Mensah-Sieh family, after arriving in the United States from Liberia. Police officers were stationed outside their homes to enforce the

7

quarantine orders. As alleged in the complaint, the quarantine caused plaintiffs to suffer physically, emotionally, and financially. For example, Boyko was "cut off from family, friends, and colleagues," he was unable to spend time with his son, his girlfriend was prohibited by the quarantine order from entering their shared apartment, and he was unable to meet his employment obligations. J. App'x at 37. Skrip's research and work at Yale as well as her volunteer activities were adversely impacted. And the inability of the Mensah-Sieh family to leave their residence (a single room in a basement for six individuals) "severely diminish[ed] their everyday life activities including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." J. App'x at 48.

Second, the complaint alleges -- in great detail and with ample support -- that quarantine was not necessary in the circumstances here and that less restrictive alternatives existed to protect public health and safety. As alleged in the complaint, by the time the quarantine orders were issued in Fall 2014, doctors and scientists had been dealing with Ebola for some twenty-two months and the science was well-established. "The overwhelming consensus in the scientific community at the time was, and remains, that asymptomatic

8

individuals cannot transmit Ebola and do not require quarantine." J. App'x at 29. Rather, Ebola "is spread through direct physical contact with the bodily fluids of a symptomatic person, the body of a person who has died from Ebola, or objects contaminated with the virus, such as used needles." J. App'x at 26. Symptoms include fever, headache, joint and muscle pain, diarrhea, and vomiting. Unlike diseases such as tuberculosis (and COVID-19), Ebola cannot be spread through the air.

According to the complaint, on August 22, 2014, the Centers for Disease Control and Prevention (the "CDC") released guidance for monitoring "asymptomatic individuals returning from West Africa with 'no risk' or 'low risk' of exposure" to Ebola, and it "recommended only self-monitoring or active monitoring for twenty-one days and recommended no movement restrictions or quarantine." J. App'x at 27. The guidance did not recommend quarantine even for individuals with a high risk of exposure. As the public health experts point out in their amici brief, overly restrictive responses to epidemics have adverse consequences, as health care professionals, scientists and epidemiologists, and aid workers will be deterred from traveling to impacted countries to provide medical help and other assistance.

9

In October 2014, the CDC, in conjunction with the Department of Homeland Security ("DHS"), implemented a screening process for individuals arriving in the United States from Liberia, Guinea, and Sierra Leone, ensuring that they had no symptoms or a known history of exposure to Ebola before permitting them to exit the airport, and referring them to the appropriate state or local health authorities if circumstances warranted. Plaintiffs were asymptomatic when they arrived in the United States from Liberia, and they had not been in contact with symptomatic individuals. They went through the CDC screening procedures and were cleared to enter the country. While Boyko developed a fever at one point after returning to the United States, he was given a blood test which came back negative for Ebola (in fact, he was tested three times, with a negative result each time). The complaint alleges that Dr. Mullen and other state officials knew that plaintiffs were "not sick and not a risk to public health." J. App'x at 29 (quoting statement made by a Department of Public Health spokesperson in October 2014). Yet, the complaint alleges, they ordered plaintiffs into quarantine, even though they knew that quarantine was not necessary and that alternative, less restrictive measures -- such as monitoring -- were available to protect the public health and safety. Connecticut's quarantine

10

program did not provide for individual risk assessments of travelers from affected countries, and did not, for example, consider whether they had had past contact with Ebola-infected persons.  Rather, the policy required that *all* asymptomatic individuals arriving from an affected country were to be quarantined at home for twenty-one days.

Moreover, the complaint further alleges that on October 27, 2014, the Connecticut officials revised their quarantine guidelines so that asymptomatic travelers arriving from affected areas were subject only to active monitoring, unless an individualized assessment determined quarantine was necessary.  The officials did not, however, release plaintiffs from quarantine or review whether continued quarantine was necessary.

Third, the complaint alleges that the Mensah-Sieh family did not receive written notice of the quarantine order or any information about their right to challenge the quarantine order.  It alleges that Skrip did not receive any such information either, until she requested it five days after she was orally informed of her quarantine.  Moreover, the complaint alleges that plaintiffs did not receive individualized consideration of whether quarantine was warranted in their cases, either initially or after the state changed its policies.

11

In short, in my view the complaint alleges, plausibly and with great detail, that Dr. Mullen and the other state officials infringed on plaintiffs' fundamental right to liberty, without justification or individualized consideration, when alternative, less restrictive measures were available to protect the public health and safety.

## II.

### A.

Qualified immunity "protects government officials from suits seeking to impose personal liability for money damages based on unsettled rights or on conduct that was not objectively reasonable." *Tenenbaum v. Williams*, 193 F.3d 581, 595-96 (2d Cir. 1999). In assessing a qualified immunity defense, the court must "accept as true all well-pled factual allegations, and draw all reasonable inferences in the plaintiff's favor." *Warney v. Monroe Cty.*, 587 F.3d 113, 116 (2d Cir. 2009). "The defendant bears the burden of pleading and proving the affirmative defense of qualified immunity." *Blissett v. Coughlin*, 66 F.3d 531, 539 (2d Cir. 1995); *see also Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011).

To determine whether an individual is entitled to qualified immunity, the court must "engage in a two-part inquiry: whether the facts

12

shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson v. Callahan*, 55 U.S. 223, 232 (2009)). While there need not be "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citation omitted).

As discussed above, in my view the facts alleged in the complaint make out a violation of plaintiffs' rights to substantive and procedural due process. Similarly, in my view these rights were clearly established when Dr. Mullen and the other state officials required plaintiffs to be quarantined. I believe it was error for the district court, on a motion to dismiss when it should have assumed the factual allegations of the complaint to be true, to sustain the affirmative defense of qualified immunity as a matter of law.

The district court held that Dr. Mullen's actions did not violate clearly established law because there is no case law regarding an individual's substantive and procedural due process rights in a quarantine scenario, and that, in any event, quarantine here was "objectively reasonable." *Liberian Cmty. Ass'n*

13

*of Connecticut v. Malloy*, No. 3:16-CV-00201(AVC), 2017 WL 4897048, at *9 (D. Conn. Mar. 30, 2017). As discussed above, however, there are some quarantine and other isolation cases, as well as other analogous cases, including, for example, civil commitment cases dealing with compulsory confinement to protect public safety. And while it may be true that there have been few epidemic cases over the years, the Supreme Court has noted that a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *United States v. Lanier*, 520 U.S. 259, 271 (1997) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The general constitutional rules discussed above are beyond debate. Freedom from physical restraint is a fundamental liberty interest that cannot be infringed upon by the government unless the restriction is narrowly tailored to further a compelling state interest and less restrictive alternatives to accomplish that goal are not available. *See, e.g.*, *Reno*, 507 U.S. at 301-02; *Shelton*, 364 U.S. at 488. Moreover, even assuming some ambiguity in the case law, the Connecticut statute -- which incorporates due process protections -- applies with obvious clarity here, as the statute specifically provides that quarantine may be ordered

14

only if *necessary* to protect the public health, and only if quarantine is the *least restrictive alternative* available. The complaint alleges in great detail that, given the nature of Ebola, the CDC, scientists, and health experts uniformly agreed that quarantine was not necessary for individuals like plaintiffs, who were asymptomatic and who were no-risk or low-risk for Ebola exposure, and that less restrictive alternatives, such as active monitoring, were available to protect the public. Hence, the complaint plausibly alleges that it was not objectively reasonable for Dr. Mullen and the other state officials to order plaintiffs into quarantine, and to have done so without proper notice or individualized assessment or other procedural safeguards.

Finally, I note that the complaint plausibly alleges that the Connecticut officials did not act in good faith, as they purportedly imposed quarantine on plaintiffs not based on scientific or medical reasons but for political reasons. The complaint alleges that Dr. Mullen and other state officials knew that quarantine was not necessary to protect the public health. But in October 2014, the Governor of Connecticut was "actively campaigning to be re-elected . . . [and p]ublic polling and media accounts at the time described the gubernatorial race as extremely close." J. App'x at 27. The Connecticut officials

15

adopted a policy, as the Governor's office apparently touted, that was "more stringent" than guidelines issued by the CDC, one that mandated quarantine even for asymptomatic individuals, when quarantine was not scientifically justified. J. App'x at 28-29. The complaint alleges that the state officials ordered plaintiffs to be quarantined and then continued them in quarantine, even though they knew plaintiffs did not present a risk to public health, because of "sensationalist news accounts [that] stoked public fear that travelers might bring Ebola across the ocean to [Connecticut]." J. App'x at 20.

These allegations, in my view, are plausible. Accordingly, I dissent from the majority's affirmance of the district court's dismissal of plaintiffs' claims for damages.